IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| **CHARLOTTE K.**, as parent and next friend of | ) | |
| **GILLIAN K.**, a minor, and **KIMBERLY K.**, as | ) | |
| parent and next friend of **MATTHEW K.**, a | ) | |
| minor, | ) | |
|       Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No.: 08-C-50115 |
| | ) | |
| **ROCKFORD BOARD OF EDUCATION** | ) | |
| **DISTRICT #205,** | ) | |
|       Defendant. | ) | |

## DEFENDANT'S OPPOSITION TO
## PLAINTIFFS' PETITION FOR INJUNCTIVE RELIEF

NOW COMES the Defendant, THE BOARD OF EDUCATION OF THE ROCKFORD

PUBLIC SCHOOLS, DISTRICT, NO. 205 ("District"), by and through one of its attorneys,

THOMAS J. LESTER of HINSHAW & CULBERTSON, hereby opposing Plaintiff's Petition for

Injunctive Relief. In support of its position, the District attaches as Exhibit A the Affidavit of

Assistant Superintendent Colleen Cyrus.

### FACTUAL SUMMARY

GILLIAN K. and MATTHEW K. are high school students with severe and profound

disabilities. The students have been enrolled in the Rockford Public Schools, District #205

("District"). The most recent agreed upon Individualized Education Plan ("IEP") which has been

implemented for MATTHEW K. requires MATTHEW K. to be provided with educational

services, speech/language services, and occupational therapy. The occupational therapy service

is directed at addressing development of functional hand skills for classroom, self-help, and

vocational fine motor tasks. (Cyrus Affidavit ¶41). The most recent agreed upon Individualized

Education Plan which has been implemented for GILLIAN K. requires GILLIAN K. to be

provided with educational services, speech/language services, occupational therapy, and adaptive physical education. (Cyrus Affidavit ¶40).

Prior to the beginning of the 2008 summer session, the students were receiving special education and related services at the District's Page Park facility located 5949 Safford Road, Rockford, IL 61101. (Cyrus Affidavit ¶7). The special education program which was previously located at Page Park is now called the "Aspire Program." (Cyrus Affidavit ¶6). At the end of the 2007/2008 school year, the Aspire Program was relocated to a different District facility, namely, Wilson School, 520 N. Pierpont Avenue, IL 61101. (Cyrus Affidavit ¶7). Although the District is making additional structural improvements, the relocation of the Aspire Program has been effectively completed; and, on June 23, 2008, the Aspire Program began providing services to students enrolled in Summer School. (Cyrus Affidavit ¶8).

The principal, teachers, and staff who were previously assigned to the Page Park facility have been relocated to the Aspire Program at Wilson School. (Cyrus Affidavit ¶9). All sensory and vocational equipment and assistive technology and equipment previously located at Page Park have been moved to the Aspire Program. (Cyrus Affidavit ¶¶24-25). Further, the Aspire Program has replicated the life skills building opportunities such that there is a room that mirrors a house with a bedroom, living room and dining area to facilitate teaching kids how to make their bed, put clothes away, and practice eating. This room is actually larger than the life skills room which was previously housed at the Page Park facility. (Cyrus Affidavit ¶9). Inasmuch as all of the essential services and programs which were previously located at Page Park have been relocated to the new Aspire Program facility and/or are available at the new Aspire Program facility, all of the services set forth in the IEPs of GILLIAN K. and MATTHEW K. can and are being provided at the Aspire Program facility. (Cyrus Affidavit ¶40-41). Moreover, the District

2

continues to implement the Plaintiff students IEP placement decisions in that the students are placed in a separate public facility albeit in a different location within the District. (Cyrus Affidavit ¶42).

Concurrent with the relocation of the Aspire Program from Page Park to Wilson School, programs have been moved from other facilities into the Page Park facility; these moves have involved construction/technology projects as well as the moving of equipment, furniture, textbooks, supplies, etc. (Cyrus Affidavit ¶10). In fact, there have been a series of programs that have been relocated which impact the assignment of hundreds of students. Significant planning and remodeling was involved in the program relocations. The District would not be able to return all of the programs to their prior facilities prior to the start of the 2008/2009 school year. (Cyrus Affidavit ¶10).

Plaintiffs nevertheless seek an injunction to prevent the District from completing the remaining structural alterations to the Page Park facility with the intent of later seeking an order requiring the District to return the students to the Page Park facility. The articulated reason that the Plaintiffs seek extraordinary relief is that the students will suffer irreparable harm is they do not have access to a swimming pool, playground, and bathrooms in each and every classroom. (Complaint ¶30). None of these amenities are identified in the Plaintiff students' IEPs as necessary to ensure the students receive a free and appropriate public education and/or make progress toward their respective educational goals.

The injunctive relief requested by the Plaintiffs is made in the context of a suit brought under the Individuals with Disabilities Education Act ("the IDEA"), 20 U.S.C. § 1400 *et seq.* (1996). In the single-count Complaint filed against the District, the Plaintiffs also invoke the Americans with Disabilities Act of 1990 ("ADA"), §2 *et seq.*; 42 U.S.C. §12101 *et seq.*, and the

3

Rehabilitation Act of 1973, §501 *et seq.*, 29 U.S.C. §791 *et seq.*; and 42 U.S.C. §1983 (alleging that the students' constitutional rights to equal protection and due process have been violated).

## ARGUMENT

Plaintiffs cannot meet their heavy burden of establishing an entitlement to a restraining order or injunction.  To obtain the extraordinary remedy of an injunction, Plaintiffs must establish that: (1) their case has some likelihood of success on the merits; (2) no adequate remedy at law exists; and (3) they will suffer irreparable harm if the injunction is not granted. *Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 895 (7th Cir. 2001).  If the Court is satisfied that those requirements have been met, then it must "consider the irreparable harm that the nonmoving party will suffer if preliminary relief is granted, balancing such harm against the irreparable harm the moving party will suffer if relief is denied." *Id.* Finally, the court must consider how the public's interests would be affected by granting or denying the preliminary relief. *Id.*

Here, because Plaintiffs cannot establish any elements necessary to obtain a temporary restraining order or preliminary injunction, their petition should be denied.

In addition, the petition of Plaintiffs KIMBERLY K. and MATTHEW K. should be denied for the reason that the District is not obligated by law to provide MATTHEW K. with any special education and related services inasmuch as he does not reside within the District's boundaries.

## I.     Plaintiffs are not likely to succeed on the merits.

Plaintiffs' petition for injunctive relief must be denied because they have no likelihood of success on the merits of their underlying IDEA claim.  Plaintiffs' claims cannot succeed on their merits because: (1) Plaintiffs have failed to exhaust their administrative remedies; and, (2) the

4

action of moving the Aspire Program to a different building did not constitute a change in "educational placement" which would trigger due process duties.

### A.    Plaintiffs have failed to exhaust their administrative remedies.

In the present case, Plaintiffs are seeking relief under the IDEA for alleged violations of the Act. Specifically, the Plaintiffs are asking this Court to prevent the District from removing the playground equipment and permanently closing the swimming pool at the Page Park facility.

Judicial relief is unavailable under the IDEA until all administrative procedures have been exhausted. *Honig v. Doe*, 484 U.S. 305, 326-27 (1988). Indeed, the Seventh Circuit has held that, whenever relief is available under the IDEA, a plaintiff must use the IDEA's administrative system regardless of the statute invoked. *Charlie F. v. Board of Educ. of Skokie School Dist. 68*, 98 F.3d 989, 992-93 (7th Cir. 1996). The IDEA's exhaustion requirement serves a number of policy objectives: it allows deference to agency expertise in resolving educational matters; it gives the agency a first opportunity to correct errors; it presents courts with a more fully developed record; and it prevents parties from deliberately disregarding the statute's comprehensive procedures and remedies. *See, e.g., Charlie F.*, 98 F.3d at 992-93; *Bills v. Hommer Cons. Sch. Dist. No. 33-C*, 959 F. Supp. 507, 511-13 (N.D. Ill. 1997). As the Seventh Circuit explained, "educational professionals are supposed to have at least first crack at formulating a plan to overcome the consequences of educational shortfalls." *Charlie F.*, 98 F.3d at 992.

In the present case, the Plaintiffs are requesting that this Court grant relief clearly available under the IDEA. If the Plaintiffs wish to challenge the Plaintiff students' educational program and placement, they may do so by requesting an administrative due process hearing. If

5

the Plaintiffs are dissatisfied with the administrative ruling, then they may seek relief from the federal district court. 20 U.S.C. §1415(i)(2). Until they exhaust their administrative remedies, however, the instant Complaint cannot succeed. Therefore, the Plaintiffs' petition for injunctive relief should be denied in its entirety.

**B.** *The District has not effectuated a change in Plaintiff students' educational placement.*

Plaintiffs are unable to show a violation of stay-put. Section 1415(j) of the IDEA states that, unless agreed otherwise, students are to remain in their "then current educational program" pending the resolution of the special education disputes with their schools. 20 U.S.C. §1415(j). This is commonly referred to as the "stay-put" placement. The purpose of stay-put is to maintain the status quo pending resolution of the due process hearing. *Board of Educ. of Oak Park and River Forest High Sch. Dist. 200 v. Illinois State Bd. of Educ.*, 79 F.3d 654, 657 (7th Cir 1996).

With some consistency, the courts and hearing officers have determined that the "then current educational placement" for purposes of stay-put is the IEP which has been implemented at the time the due process is received. *See, e.g., Rodiriecus v. Waukegan School Dist. No. 60*, 889 F.Supp. 1045, 1049 (N.D. Ill. 1995), *rev'd on other grounds*, 90 F.3d 249 (7th Cir. 1996) ("If an IEP has been implemented, then that program's placement will be the one subject to the stay put provision."); *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624-26 (6th Cir. 1990); *Norman v. St. Anne Cmty. H.S. Dist. No. 302*, 2004 WL 3246973 at *3 (C.D. Ill. August 13, 2004); *Hinsdale Community Consolidated School Dist. 181*, 103 LRP 14496 (Hearing Officer Smaron, 2002) (adopting the standard that the stay put placement is the IEP placement that was implemented); *Will County School Dist. No. 92*, 35 IDELR 231 (Hearing Officer Cook, 2001) ("Once the IEP is actually implemented, then the IEPs placement becomes the placement for stay put purposes.").

6

In this case the Plaintiff students' IEPs had been implemented long before the District received the parents' written due process request. Specifically, Gillian K.'s most recent IEP was implemented following the January 17, 2008 IEP meeting with Gillian K.'s parent. Matthew K.'s IEP was implemented following the February 21, 2008 IEP meeting with Matthew K.'s parent. (Cyrus Affidavit ¶¶40-41). That an IEP be implemented no later than 10 days of its development, unless the parties agree otherwise, has been a long standing practice in special education. Section 226.220(a) of the Illinois Administrative Code indicates parents are to be provided with a copy of the IEP "immediately" following a review or revision of the IEP and that its terms be implemented no later than 10 calendar days thereafter. 23 Ill. Admin. Code 226.200(a). The purpose of notice provisions such as this is to ensure the parent understands the content and terms of the IEP to be implemented.

The current IEPs of the Plaintiff students do not require the special education and related services to be provided at the Page Park facility. Nor do the IEPs require that the District provide the students with a swimming pool, garden, playground, or nature trail. Rather, the IEPs require the District to provide special education and related services in a dedicated special education facility. The District is providing the requisite services as set forth in the Plaintiff students' IEPs. Plaintiffs make no allegation to the contrary.

The implementation of stay-put is an "inexact science" that depends on the context and facts of each case. *Board of Educ. of Comm. High School Dist. 218 v. Illinois State Bd. of Educ.*, 103 F.3d 545, 548-49 (7th Cir. 1996). Typically, "then-current educational placement" for disabled students refers to the student's general educational program. *Id.* at 548. Further, "then-current educational placement" has been interpreted in the Seventh Circuit to mean "something more than the actual school attended by the child and something less than the child's ultimate

educational goals." *Id.* at 549.  In arriving at this definition, the Seventh Circuit relied upon the decision issued by the Second Circuit in *Concerned Parents and Citizens v. New York Board of Educ.*, 629 F.2d 751 (2d Cir. 1980).

In *Concerned Parents and Citizens v. New York Board of Educ.*, 629 F.2d 751 (2d Cir.1980), the school district had transferred special education students from one building, in which the special education students comprised a majority and received an "extremely innovative educational program," to other buildings in the district, in which they were then a minority. Nevertheless, the Second Circuit held that the action of the school district did not constitute a change in "educational placement" which would trigger due process duties, even though the classes in the new schools varied in some respects from the unusual program available at the former school. *Id.* at 756. The Court construed the term "educational placement" to refer "only to the general educational program in which the disabled child is placed and not to all the various adjustments in that program that the educational agency, in the traditional exercise of its discretion, may determine to be necessary." *Id.*  In this case, there has been no change in either of the students' general educational programs.

Likewise, in *White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 379 (5h Cir. 2003), the Fifth Circuit addressed an analogous case, in which the parents sought to require the school district to place their deaf child in a mainstream classroom in a neighborhood school. The Court held that the parents did not have a right under the IDEA to participate in site selection, because the term "educational placement" referred not to a place, but to a program of services. *Id.*

Here, the record reflects that the District is offering the same program and services albeit in a different facility. (Cyrus Affidavit ¶42). All of the services contained in the Plaintiff students' IEPs continue to be provided on a daily basis; these services are provided by the same

8

teachers and staff who were previously located at the Page Park facility. (Cyrus Affidavit ¶9).
Likewise, all of the sensory and vocational equipment and all of the assistive technology and
equipment which was previously located at Page Park has been moved to the Aspire Program.
(Cyrus Affidavit ¶24-25). Any changes resulting from the move to the new facility are
inconsequential and far more minimal than those involved in *Concerned Parents* and *White*.
Accordingly, Plaintiffs are unable to show that the District has violated stay-put, and their
request for injunctive relief should be denied as a result.

## II.     Plaintiffs will <u>not</u> suffer irreparable harm.

The IEPs of the Plaintiff students identify the special education and related services that
are needed for the students to obtain a free and appropriate public education and to make
adequate progress in the educational setting. Plaintiffs do not attach the students' IEPs to their
Complaint/Petition. However, Plaintiffs implicitly admit that the students' IEPs do not include
any requirement for the District to provide a therapeutic pool, therapeutic playground, or
bathroom facilities in each classroom. (Complaint ¶27). Plaintiffs allege only three factors which
will cause Plaintiffs irreparable harm, which are that at Wilson School Plaintiffs will not
provided with (i) a therapeutic pool, (ii) a therapeutic playground;  and (iii) bathrooms (or at
least a sink) in their respective classrooms. (Complaint ¶30).  The speculative harm identified by
the Plaintiffs in the Complaint is that Plaintiff students will be exposed to unsanitary conditions
and/or "likely regress" absent the District providing the Plaintiff students with a therapeutic pool,
therapeutic playground, and bathroom facilities in each classroom. (Complaint ¶¶23, 29).
However, none of the Plaintiff students' IEPs indicate, that in order to make adequate progress in
the educational setting, the students must have access to a pool or a "therapeutic" pool, a
"therapeutic" nature trail, a "therapeutic" playground, or bathroom facilities within each

70566488v1 783826

classroom. (Cyrus Affidavit ¶¶40-41).  Therefore, Plaintiffs cannot show that they will suffer irreparable harm as a result of not having these desired amenities.  The District nevertheless separately addresses each issue below.

**Bathroom Facilities**

Plaintiffs admit that there are bathroom facilities available to the students at the Aspire Program. (Complaint ¶22).  At the Page Park facility, restrooms were located in some of the classrooms, but not all of the classrooms. (Cyrus Affidavit ¶34). The sinks/restrooms located at the Page Park facility were installed for the purpose of convenience when there were a large number of students participating in the program. (Cyrus Affidavit ¶34).  Restrooms at the Aspire Program are sufficient to meet the needs of the students and meet accessibility requirements under State and Federal laws, and all applicable life/safety code requirements related to toileting. (Cyrus Affidavit ¶35). The restroom facilities include stalls, urinals (in the boys' restroom), sinks, and they are wheelchair accessible. (Cyrus Affidavit ¶35). Contrary to Plaintiffs' allegations, diaper changing at the Aspire Program does not occur in the open classroom.  Rather diaper changing occurs in the designated changing areas which are enclosed, providing privacy and sanitary conditions for the student. (Cyrus Affidavit ¶33).

The Plaintiffs also attempt to argue that the Plaintiff students are somehow disadvantaged because they must walk down a short hallway in order to access the bathroom facilities which effectively take the students away from their classroom activities. (Cyrus Affidavit ¶33). This argument is nonsensical.  The Aspire Program students are taken away from their activity to address toileting activities whether or not there is a bathroom in a classroom or down the hall. Staff regularly works with students on appropriate bathroom etiquette and skills throughout the District, as needed, without access to classroom specific bathrooms, as students need to learn

10

appropriate toileting etiquette in a community bathroom such as are available at the Aspire Program. Additionally, a handicapped accessible shower has been installed for student use as needed. (Cyrus Affidavit ¶36). Therefore, contrary to Plaintiffs' allegations, Plaintiffs will not suffer irreparable harm as a result of not having a bathroom in each classroom.


**Swimming Pool**

Plaintiffs admit that the students have not had use of a pool for at least one year. (Complaint ¶19). The District does not currently plans to provide a pool for the Aspire Program students. However, even when the pool was made available, the majority of the students did not use the pool. (Cyrus Affidavit ¶26). To the extent such a need may arise in the future to provide hydro-therapy, the District has alternative options for meeting the needs of the Aspire Program students, such as installing a whirl pool; outsourcing the service, at District expense; providing the student with an alternative placement; transporting the student to an alternate location within the District for such services (inasmuch as all of the pools within the District have wheel chair lifts and some are heated). (Cyrus Affidavit ¶27). Therefore, Plaintiffs cannot show that they will suffer irreparable harm as a result of not having a swimming pool on-site at the Aspire Program facility.

**Playground**

The playground at the Page Park facility was wheelchair accessible and the District has no intent to demolish playground equipment. Currently the District is seeking to move the equipment to places where other children with disabilities can benefit from the equipment, and no final decisions have yet been made. (Cyrus Affidavit ¶30). At the Aspire Program, the

11

District is developing an outside physical activity area on a side of the building where wheelchair and other physical activities can take place. (Cyrus Affidavit ¶31). There are also plans are to upgrade and develop the current nature trail that is presently adjacent to the Aspire Program facility, but has not been maintained for student use in the past. (Cyrus Affidavit ¶31). No "playground" area is intended at the Aspire Program inasmuch as the students are high school aged students and a playground for their age and skill level is inappropriate. Students have alternate opportunities to engage in age appropriate recreational and physical activity, e.g. Adaptive Physical Education classes, and use of an all-purpose room. (Cyrus Affidavit ¶31). Therefore, Plaintiffs cannot show that they will suffer irreparable harm as a result of not being provided with a playground.

All of the services set forth in the Plaintiff students' IEPs are being provided in the requisite public school setting. Accordingly, Plaintiffs can show no threat of irreparable harm based on the allegations contained in their Complaint and their petition should be denied as a result.

**III.    The District will suffer irreparable harm if injunctive relief is granted; therefore, the public interest will not be served by the requested relief.**

The issuance of injunctive relief in this case will not serve the public interest because it will cause irreparable harm to the District. The entry of an injunction would undermine the School District's discretion to make minor program adjustments which do not rise to the level of a change in placement. Moreover, the entry of an injunction would provide the Plaintiffs with greater benefits than they would otherwise have if the Court were to maintain status quo. The Plaintiffs have acknowledged that they are not entitled to choose the specific building in which services are to be provided. (Complaint ¶14). The Plaintiff students' IEPs also do not require the District to provide the students with a therapeutic playground, therapeutic garden, therapeutic

70566488v1 783826

nature trail, and therapeutic pool. Yet, the Plaintiffs are demanding that all construction and alterations be halted at the Page Park facility so that the Plaintiffs can return to this particular facility and obtain services which are not in their IEPs. However, even if the demanded amenities were included in the Plaintiff students' IEPs, the District could provide these services in alternative ways which would not involve returning the students to the Page Park facility.

The District has already effectuated the relocation of the Aspire Program from Page Park to Wilson School. Likewise, the District has already effectuated the relocation of numerous other programs from and to various facilities which impact hundreds of students. The District would not be able to return all of the programs to their prior facilities prior to the start of the 2008/2009 school year. (Cyrus Affidavit ¶10). Therefore, a proper balancing of the potential harms to be suffered weighs in favor of the District.

In contrast and as discussed in detail above, Plaintiffs cannot demonstrate any irreparable harm as a result of the denial of injunctive relief. Therefore, the Plaintiffs' request for injunctive relief should be denied in its entirety.

**IV.    Inasmuch as Plaintiffs KIMBERLY K. and MATTHEW K. do not reside in the District's boundaries, the District is not obligated by law to provide special education and related services to MATTHEW K. Therefore, inasmuch as he has brought suit against the wrong party, his case should be dismissed with prejudice.**

States are required to provide special education and related to services to eligible students residing within their borders. 20 U.S.C. §1412. The IDEA does not dictate how to determine whether a child, parent, or guardian is or is not a "resident" of a state or school district. Rather, the IDEA leaves to the states the assignment and allocation of financial responsibility for special education cost, the definition of "residency" and the choice as to whether to provide a free and appropriate public education to children who may not be considered "residents" under state law in addition to those whose residency is not an issue. Illinois law assigns responsibility for

13

special education services to the school district where the student resides. 23 Ill.Admin.Code §226.700; 20 ILCS 5/14-6.01 and 14-7.01. In many, if not most circumstances, for special education purpose, the residence of one or both parents determines student residence. 105 ILCS 5/14-1.11 and 14-1.11a.

In the present suit, Plaintiffs have plead that MATTHEW K. is the minor son of KIMBERLY K. and that KIMBERLY K. is a resident of the City of Naperville. (Complaint ¶1; and Attachment A of the Complaint). Pursuant to Illinois law, then, the responsible school district is Indian Prairie District #204 – which is the school district in which the parent of the student resides. 105 ILCS 5/14-1.11; *see also, e.g., James ex rel. James v. Upper Arlington City Sch. Dist.*, 228 F.3d 764 (6th Cir. 2000) (school district's obligation to deal with a child in need of services, and to prepare an IEP, under the IDEA, derives from residence in the district, not from enrollment). To the extent KIMBERLY K. is not satisfied with the placement, program, or level of services provided by the Rockford Public Schools, this dispute must properly be brought against Indian Prairie District #204. Therefore, the Complaint/Petition of KIMBERLY K. and MATTHEW K. should be dismissed with prejudice.

## CONCLUSION

Plaintiffs have not and cannot establish that they will likely succeed on the merits of their case or that they will suffer irreparable harm if the injunction is not granted. Moreover, in comparison, the District will suffer irreparable harm should an injunction issue. Therefore, for the reasons stated herein, Plaintiffs' petition for injunctive relief should be denied in its entirety.

WHEREFORE, Defendant, THE BOARD OF EDUCATION OF THE ROCKFORD PUBLIC SCHOOLS, DISTRICT NO. 205, respectfully requests that this Court dismiss

14

70566488v1 783826

Plaintiff's Complaint with prejudice, and for such other and further relief as this Court deems just and appropriate.

Respectfully submitted,

HINSHAW & CULBERTSON LLP

By: s/Thomas J. Lester                          
     Thomas J. Lester

Thomas J. Lester
Hinshaw & Culbertson LLP
100 Park Avenue
P.O. Box 1389
Rockford, IL 61105-1389
815-490-4900

70566488v1 783826

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

|  |  |  |
|---|---|---|
| **CHARLOTTE K.**, as parent and next friend of **GILLIAN K.**, a minor, and **KIMBERLY K.**, as parent and next friend of **MATTHEW K.**, a minor,<br>　　　　Plaintiffs, | )<br>)<br>)<br>)<br>)<br>) |  |
| v. | )<br>) | Case No.: 08-C-50115 |
| **ROCKFORD BOARD OF EDUCATION DISTRICT #205,**<br>　　　　Defendant. | )<br>)<br>) |  |

## AFFIDAVIT OF COLLEEN CYRUS

I, Colleen Cyrus, being first duly sworn on oath, do hereby attest to the following, based upon my personal knowledge, and would testify in a court of law:

1.　I am the Assistant Superintendent of Rockford Public Schools, District #205 ("District").

2.　I possess a Type 75 general administrator's certificate with an endorsement as a State Certified Director of Special Education. I also possess a LBS1 Teaching Certificate which allows me to teach pre-kindergarten through high school students in all disability categories – except for hearing and vision impaired students.

3.　I was hired by the District in 1989 as a special education teacher. In 1994, I was promoted to the position of Special Education Supervisor. In 2004, I was promoted to the position of Director of Special Education of the Rockford Public Schools, District #205. Thereafter, in October 2007, I was promoted to the position of Assistant Superintendent.

4.　I have supervisory responsibility for overseeing the provision of special education and related services within the District, including Special Education due process and complaint proceedings.

**EXHIBIT**

**A**

70566340v1 747879

5.      As part my duties, I am authorized to certify and/or testify concerning the District's Special Education policies and procedures as well as its record-keeping procedures, including customary practices and the completeness, accuracy and/or authenticity of any original or copy of a record as such records relate to Special Education matters.

6.      The former Page Park Program for students with disabilities is now called the Aspire Program.

7.      The Aspire Program was previously located at the District's Page Park facility, 5949 Safford Road, Rockford, IL 61101.

8.      At the end of the 2007/2008 school year, the Aspire Program was relocated to a different District facility, namely, Wilson School, 520 N. Pierpont Avenue, IL 61101. A true and correct copy of the layout of the Aspire Program at Wilson School is attached hereto as Exhibit A. Although the District is making additional structural improvements, the relocation of the Aspire Program has been effectively completed; and, on June 23, 2008, the Aspire Program began providing services to students enrolled in Summer School.

9.      The principal, teachers, and staff who were previously assigned to the Page Park facility have been relocated to the Aspire Program at Wilson School.

10.     Concurrently, programs have been moved from other facilities into the Page Park facility; these moves have involved construction/technology projects as well as the moving of equipment, furniture, textbooks, supplies, etc. In fact, there have been a series of programs that have been relocated which impact the assignment of hundreds of students. Significant planning and remodeling was involved in the program relocations. The District would not be able to return all of the programs to their prior facilities prior to the start of the 2008/2009 school year.

70566340v1 747879

11.    The Page Park facility has approximately 24 classrooms and has a special education student capacity limit of 240. The maximum number of special education students that have been in attendance at Page Park since 1994 is 140.

12.    The Aspire Program facility at Wilson School has 13 classrooms (plus a gymnasium) and has a student capacity limit of 130.

13.    Over the years, the enrollment in the Aspire Program has declined due to the federal and state mandates requiring school districts to ensure students are placed in the least restrictive environment. The parents of the students who were moved in order to meet the least restrictive environment requirements of the IDEA have not complained or filed due process; the placement and programs of these students continue to be monitored to ensure that the students make progress.

14.    Thus, during the 2007/2008 school year, there were a total of 41 students enrolled in the Aspire Program at the Page Park facility, of whom 31 resided within the District's boundaries; the remaining 10 students were residents of other school districts. Only 32 students are presently enrolled in the Aspire Program.

15.    The decision of the District to relocate the Aspire Program was based upon a recommendation made by the Education Committee based upon the Committee's analysis of the current programs and the effective use of building space.

16.    The Auburn Freshman Campus Program is also located at Wilson School. However, although the two programs are located under the same roof, the programs are housed in distinct, secure locations within the building. Thus, the Aspire Program and Auburn Freshman Campus program facilities have separate entrances and exits, transportation facilities, and restrooms.

3

17.    Moreover, the Aspire Program and Auburn Freshman Campus program have separate administration, teaching faculty, and curriculum; and, there are no program overlaps. They function as entirely separate facilities.

18.    Contrary to Plaintiffs' allegations, students are not locked in their classrooms.

19.    When students at the Aspire Program are dropped off for bus transportation, they will walk or be assisted otherwise from the curb to the front door of the Aspire Program, which is estimated to be approximately 25 to 30 feet – and is a comparable distance as that at the Page Park facility.  The Page Park facility covered drop off area was in existence when the program moved into that building and was not designed specifically for students with disabilities.

20.    Auburn Freshman Campus students cannot access the Aspire Program classrooms or other facilities from the Auburn Freshman Campus portion of the building, as the only internal door which provides access to the Aspire Program classrooms and facilities has a magnetic lock which can only be unlocked with a key – unless there is a fire, in which case, all of the magnetic doors at Wilson School will automatically unlock.

21.    During inclement weather, Aspire Program teachers/staff may escort the students through one hallway of the Auburn Freshman Campus to an elevator in order to access the lower gymnasium, which is reserved solely for the Aspire Program students.  Notwithstanding, Aspire Program students will only be permitted to use the hallway of the Auburn Freshman Campus at times when the Auburn Freshman Campus students are in classes.  Otherwise, the Aspire Program students may access the gym from its external entrance, which is located on the ground level.

4

22.     The Page Park facility did not contain any elevators.  With the exception of the lower gym, all of the Aspire Program classrooms and amenities are located on the first floor such that an elevator is not necessary.  Plaintiffs' allegations to the contrary are not true.

23.     At the Aspire Program, students have an Adaptive Physical Education program with a dedicated Adaptive Physical Education instructor assigned to the Aspire Program, just as at Page Park.  In addition to the gymnasium, there is one classroom on the same level as other classrooms in the Aspire Program that has been converted into an all-purpose room.

24.     All sensory and vocational equipment located at Page Park has been moved to the Aspire Program.  The District will continue to have separate spaces for these services with appropriate equipment for use with students.

25.     All assistive technology & equipment particularly designed for students located at the Page Park facility has been transferred to the Aspire Program and is fully operational.  Plaintiffs' allegations to the contrary are not true.

26.     The therapeutic pool at the Page Park facility has not been maintained or used in over a 12 month period, as no student has needed or currently needs a therapeutic pool in order to receive free appropriate public education.  In fact, even when the pool was operational, the majority of the students did not use the pool.  Further, none of the Individualized Education Plans of the students who are enrolled in the Aspire Program include any requirement that they receive services in a pool or a "therapeutic" pool.

27.     The pool at Wilson School is presently not available for any student to use and is not intended to be repaired for such use.  To the extent a need arises in the future to provide hydro-therapy as part of an IEP, the District has alternative options for meeting the needs of the Aspire Program students, such as installing a whirl pool; outsourcing the service, at District

5

expense; providing the student with an alternative placement; transporting the student to an alternate location within the District for such services (inasmuch as all of the pools within the District have wheel chair lifts and some are heated). The decision would be made on a case by case basis.

28.     The kitchen at the Page Park facility provided students access to a stove, refrigerator and sink. The kitchen/cafeteria at the Aspire Program is currently under construction and will contain a three-compartment sink, new cabinets and cupboards, a stove, a refrigerator/freezer, a washer/dryer, a laundry tub, tables with table cloths and curtains to create café like environment. Thus, to the extent students require life training skills, those needs will readily be met. It is anticipated that the kitchen area will be available within the next few weeks.

29.     Likewise, the Aspire Program has replicated the life skills building opportunities such that there is a room that mirrors a house with a bedroom, living room and dining area to facilitate teaching kids how to make their bed, put clothes away, and practice eating. This room is actually larger than the life skills room at the Page Park facility.

30.     The playground at the Page Park facility was wheelchair accessible and the District has no intent to demolish playground equipment. Currently the District is seeking to move the equipment to places where other children with disabilities can benefit from the equipment, and no final decisions have yet been made.

31.     At the Aspire Program, the District is developing an outside physical activity area on a side of the building where wheelchair and other physical activities can take place. This activity area will be for the exclusive use of the Aspire Program students. There are also plans to upgrade and develop the current nature trail that is presently adjacent to the physical activity area, but has not been maintained for student use in the past. No "playground" area is intended

6

at the Aspire Program as students are high school aged students and a playground for their age and skill level is inappropriate. Students have alternate opportunities to engage in age appropriate recreational and physical activity, e.g. Adaptive Physical Education classes, and use of an all-purpose room.

32.     In addition, the Aspire Program students will have opportunities for outside contacts to the same extent that they had at Page Park by virtue of participation in community outings.

33.     Diaper changing at the Aspire Program does not occur in the open classroom. Rather diaper changing occurs in the designated changing areas which are enclosed, providing privacy and sanitary conditions for the student. Contrary to Plaintiffs' allegations, the hand-sanitizer contained in the classrooms is not meant to be used in lieu of washing the hands of staff or students. Rather, the hand-sanitizer is an additional measure which has been implemented to prevent the spread of germs.

34.     At the Page Park facility, restrooms were located in some of the classrooms, but not all of the classrooms. The sinks/restrooms located at the Page Park facility were installed for the purpose of convenience when there were a larger number of students participating in the program. However, for over 20 years, the District has successfully placed students with severe and profound disabilities throughout the District in classrooms which do not contain sinks or bathrooms.

35.     Restrooms at the Aspire Program are sufficient to meet the needs of the students and meet accessibility requirements under State and Federal laws, and all applicable life/safety code requirements related to toileting. The restroom facilities include stalls, urinals (in the boys' restroom), sinks, and they are wheelchair accessible.

7

70566340v1 747879

36.    The Aspire Program students are taken away from their activity to address toileting activities whether or not there is a bathroom in a classroom or down the hall. Aides and other staff are available to accompany the students and assist them in the bathrooms such that the students remaining in the classroom are not left unsupervised. Staff regularly works with students on appropriate bathroom etiquette and skills throughout the District, as needed, without access to classroom specific bathrooms, as students need to learn appropriate toileting etiquette in a community bathroom such as are available at the Aspire Program. Additionally, a handicapped accessible shower has been installed for student use as needed.

37.    At the Aspire Program, there is no need for use of a key in a deadbolt to exit the building. The building door security is the same as that of all District buildings, including that located at the Page Park facility. The doors are locked from the outside with a buzzer and camera for entrance. Any party can exit without obstruction with the use of push handles, not door knobs. All entrance and exit routes at the Aspire Program meet fire code and State and Federal accessibility standards.

38.    The facility at the Aspire Program is appropriate to meet the needs of the students assigned to the building location. Page Park initially was not designed for students with disabilities either, and the Page Park program utilized both the existing and then extended portions of the building.

39.    I have reviewed the Special Education files of the students named in the instant lawsuit. The Plaintiff parents participated in Individualized Education Program meetings and had the opportunity to provide meaningful input into the resulting Individualized Education Plans ("IEPs").

8

40.    Specifically, Charlotte K. was notified in early January 2008 that her daughter's Individualized Education Plan ("IEP") was to be discussed and reviewed on January 17, 2008. Charlotte K. was present at the agreed upon January 17, 2008 IEP meeting and participated in the review and revisions to the IEP. During the meeting, the relocation of the Aspire Program was discussed; and, the IEP reflects that the "Parent expresse[d] concerns for safety and well being of [the student] in another building besides Page Park School." Notably, the agreed upon IEP does not include any requirement to provide a therapeutic playground, therapeutic nature trail, therapeutic pool, bathrooms in every classroom. Rather, the agreed upon IEP requires educational services, speech/language services, occupational therapy, and adapted physical education. The IEP does not identify the manner or methodology to be used in providing the related services (i.e., speech/language, occupational therapy, adapted physical education). All of the services set forth in the student's IEP were implemented immediately following the January 17, 2008 IEP meeting. These services can, are, and will continue to be provided at the Aspire Program.

41.    Kimberly K. was notified and participated in the development of her child's successive Individualized Education Plans ("IEP"). As documented in the IEP – which was provided to the parent – on January 24, 2007, Kimberly K. was present when the IEP team discussed transitioning her son, Matthew K., "to a less restrictive placement for the 2008 school year instead of waiting until the 2009 school year when the Page Park program is scheduled to close." Kimberly K. was also present on February 21, 2008 when her son's IEP was again reviewed and revised. Notably, the agreed upon IEP does not include any requirement to provide a therapeutic playground, therapeutic nature trail, therapeutic pool, bathrooms in every classroom. Rather, the agreed upon IEP requires educational services, speech/language services,

9

and occupational therapy.   The occupational therapy service is directed at addressing development of functional hand skills for classroom, self-help, and vocational fine motor tasks. All of the services set forth in the student's IEP were implemented immediately following the February 21, 2008 meeting.   These services can, are, and will continue to be provided at the Aspire Program.

42.   The District continues to implement the Plaintiff students IEP placement decisions.   They are placed in a separate public facility albeit in a different location within the District.

43.   The District has implemented rules and policies in conformance with federal and state statutory mandates.   A change in physical location does not equate to a change in the educational placement of a student.

44.   The 2007/2008 progress reports for the Plaintiff students reveal that the Plaintiff students have making adequate progress toward the goals outlined in their respective IEPs, including all social/emotional goals.

45.   The transition from Page Park to the Aspire Program was on the Board agenda in February, 2008 and in March, 2008 for discussion and was included in the Board minutes.   In addition, the transition has been discussed at subsequent Board meetings.

46.   The facilities at the Aspire Program for meeting the needs of the students of the Aspire Program are superior to the Page Park Program.

FURTHER AFFIANT SAYETH NOT.


Colleen Cyrus

10

70566340v1 747879

SUBSCRIBED and SWORN to before me
this 26th day of June, 2008.

_____
Notary Public

Official Seal
Christina Euhus
Notary Public State of Illinois
My Commission Expires 07/23/08

HINSHAW & CULBERTSON LLP
100 Park Avenue
P.O. Box 1389
Rockford, IL 61105-1389
(815) 490-4900

11

70566340v1 747879

