**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| CHARLOTTE K., as parent and next | ) | |
| friend of GILLIAN K., a minor, | ) | |
| KIMBERLY K., as parent and next | ) | |
| friend of MATTHEW K., a minor and | ) | |
| CAROL K., as parent and next friend of | ) | |
| WILLIAM K., a minor, | ) | |
| Plaintiffs, | ) | 08-C-50115 |
| | ) | |
| vs. | ) | |
| | ) | |
| ROCKFORD BOARD OF EDUCATION | ) | |
| SCHOOL DISTRICT #205, | ) | |
| | ) | |
| Defendant. | ) | |

## RESPONSE TO DEFENDANT'S PETITION TO DISMISS BASED ON EXHAUSTION OF ADMINISTRATIVE REMEDIES

NOW COMES the Plaintiffs, CHARLOTTE K, a parent and next friend of GILLIAN K, a minor, KIMBERLY K., as parent and next friend of MATTHEW K., a minor and CAROL K., a parent and next friend of WILLIAM K., a minor, by their attorneys, LAW OFFICES OF SHRIVER, O'NEILL & THOMPSON, by Joyce O'Neill Austin, and in Response to Defendant's Petition to Dismiss Based on Exhaustion of Administrative Remedies, states as follows:

(Note this Brief does not address any other issues in Response to Defendant's Motion to Dismiss as this is all that this Court ordered at this time.)

1.    **Affirmative Defense**. Defendant's allegation that Plaintiffs failed to exhaust administrative remedies is an affirmative defense that is raised at the time of the answer.  Mosely v. Board of Educ. of City of Chicago, 434 F.3d 527 (7th Cir. 2006). Walker v. Thompson, 288 F.3d 1005, (7th Cir. 2007). Defendant has not filed an answer. Defendant has filed a F.E.D.R. CIV. P. 12(b)(6) Motion to Dismiss.

2.    **F.E.D.R. CIV. P. 12(b)(6)**. Failure to state a claim upon which relief can be granted. Defendant did file its Motion to Dismiss under 12(b)(6) that every count in the Amended Complaint be

dismissed. Under IDEA Count III refers to "education of the children" and under Section 504 (Civil Rights) Count V and Count VI refers to "access to education", which is an entirely different issue. A Rule 12(b)(6) motion does not address the merits of the Plaintiff's case instead it tests the sufficiency of the complaint. <u>Autry v. Northwest Premium Servs.</u>, 144 F.3d 1037, 1039 (7th Cir. 1998). A complaint should be dismissed if "it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim, which would entitle him to relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957) cited in <u>Kerry M. v. Manhattan School Dist. #114</u>, 2004 WL 2538303 (N.D. Ill.).

3.    **Jurisdiction.** This court still has jurisdiction in that failure to exhaust remedies does not deprive a court of jurisdiction. Exhaustion of remedies is usually waivable whereas lack of jurisdiction is not. <u>Charlie F. v. Bd. of Educ. of Skokie</u>, 98 F.3d 989 (7th Cir. 1996).

4.    **Exceptions to Exhaustion Requirement**.  There are exceptions to the requirement that a parent must exhaust administrative remedies prior to filing suit in federal or state court. These exceptions are when administrative remedies are futile, inadequate or when Plaintiffs allege "<u>structural</u> or systematic failure and seek systemwide reforms"[Emphasis added]. <u>Association for Comm. Living in Colorado v. Romer</u>, 992 F.2d 1040, (10th Cir. 1993).

A Due Process hearing under IDEA refers to education provided to each child under their I.E.P. Defendant admits that [the student's last] I.E.P.'s did not include any reference to the <u>structures</u> of the swimming pool, the playground equipment, the therapeutic equipment, nature trail, garden or playground. See Defendant's Brief in Support of Motion to Dismiss. See Exhibit A p.2-3, 7. See also Affidavit of Colleen Cyrus attached as Exhibit B p.26-31, 34-35. Ms Cyrus affirmatively swears that most of those <u>structures</u> will not be replaced and others will take time. These children Plaintiffs do not have time. They are all eighteen.

5.    **Alleged Systematic Violations**.

"The district court .....observed that the futility exception has been applied in cases of alleged systematic violations, and that such cases are often class actions. The court concluded that, because the complaint aimed at 'wrongdoing that is inherent in the <u>program</u> itself and not

directed at any individual child' the allegations of systematic violations entitled them to exemption from the exhaustion requirement." [Emphasis added] J.S. v. Attica Central Schools, 03 F2 7170 (2nd Cir. 2004).

That is the allegation in this Amended Complaint.

6.      **Allegations of Discrimination System Wide.** Defendants admit in their Brief that the allegations of discrimination listed in the Complaint are not listed in the children's individual educational programs, so the allegations must be directed to the program as a whole– essentially a lack of educational/structural and curriculum access by all of the Plaintiffs in the past three years. This is the educational program they need as a group. It is the program/structure and/or curriculum for the entire group that is lacking and which will not be nor can it be addressed in an individual Due Process hearing. The allegations in the Complaint allege a removal of these children from a physical environment without plans to replace the program and facilities that enable the children to receive a curriculum designed for all of their educational needs because all of them are severely and profoundly retarded. All of these Plaintiff children are eighteen or almost and they only have 3 more years to receive FAPE. They cannot wait until their playground is replaced. They cannot or will not be able to eat in their cafeteria and have a hot lunch choice like all other children in this District. They will no longer have reasonable access to a gym where they had a basketball team with cheerleaders. Courts have previously excused exhaustion of administrative remedies in cases that include allegations of systemic violations. See Heldman v. Sobol, 962 F.2d 148, 158 (2d Cir. 1992); Mrs. W. v. Tirozzi, 832 F.2d 748 (2d Cir. 1987); J.G. v. Bd. of Educ. of the Rochester City Sch. Dist., 830 F.2d 444 (2d Cir. 1987); Jose P. v. Ambach, 669 F.2d 865 (2d Cir. 1982). In the above cases, the court found it would be futile for the Plaintiffs to have a Due Process hearing because the hearing officer had no power to fix the problems involved. Many of the allegations in this Amended Complaint are also listed in Attica, Id. at p.15.

7.      **Stay-put Provision**. It is clear under the "stay-put" §1415 provision there is no exhaustion of administrative remedies necessary, it is like a "statutory injunction". This relief is necessary for all of these Plaintiffs or the future educational programming/curriculum is in jeopardy as

far as they have access to the appropriate programming for their disabilities. Murphy v. Arlington,

Docket #00-7358 (2nd Cir. 2002).

The stay-put rule, as it is commonly called, provides that during the pendency of any due process

proceedings, unless the school district and the parents otherwise agree, the child shall remain in the then-

current educational placement of the child. 20 U.S.C. §1415(j); 70 Fed.Reg. 35,782, 35,874 (June 21,

2005), proposing 34 C.F.R. §300.518(a); 105 ILCS 5/14-8.02a(j). The purpose of the stay-put rule is to

ensure that the educational needs of the child are met during the pendency of any proceedings conducted

pursuant to the Individuals with Disabilities Education Act. The stay-put rule acts as a mechanism to

prevent school officials from removing a child from the regular public school classroom over the

objection of the parents. School Committee of Town of Burlington, Massachusetts v. Department of

Education of Massachusetts, 471 U.S. 359, 85 L.Ed.2d 385, 105 S.Ct. 1996 (1985). See also Board of

Education of Community High School District No. 218, Cook County, Illinois v. Illinois State Board of

Education, 103 F.3d 545, 550 (7th Cir. 1996).

Courts have consistently held that "then current educational placement" refers to the last

placement as listed on the student's individualized education program. Thomas v. Cincinnati Board of

Education, 918 F.2d 618 (6th Cir. 1990). When a child cannot remain in his or her current educational

placement, however, the school district will be required to maintain the child in an educational program

that is substantially and materially the same as the student's placement during the previous school year.

Letter to Fisher, 21 I.D.E.L.R. 992 (OSEP 1994). In Letter to Fisher, the Office of Special Education and

Rehabilitative Services (formerly, the Office of Special Education Programs) opined as follows:

> In determining whether a 'change of educational placement' has occurred, the public
> agency responsible for educating the child must determine whether the proposed change would
> substantially or materially alter the child's educational program. In making such a determination, the
> effect of the change in location on the following factors must be examined: whether the educational
> program set out in the child's IEP had been revised; whether the child will be able to be educated with
> non-disabled children to the same extent; whether the child will have the same opportunities to
> participate in non-academic and extracurricular services; and whether the new placement option is the
> same option on the continuum of alternative placements.

The only option for the three child Plaintiffs for the fall is a private placement program for all three children otherwise the "new" facility at Wilson Aspire will "substantially or materially" alter the children's educational program.  These placements are the only ones available within a reasonable distance, but they are limited still compared to Page Park. These are Willow Glen in Freeport and Easter Seals in Rockford.

8.    **Placement in the Least Restrictive Environment.** A school district must balance its obligation to provide children with disabilities a free appropriate public education together with its obligation, to the maximum extent appropriate, to educate them with non-disabled children (i.e., in the least restrictive environment (ILRE)). The Seventh Circuit has noted the following:

"The FAPE provision and LRE provision are two sides of the same IEP coin. The first requirement is absolute and focuses on the school district's proposed placement....the second is relative and concentrates on other placement options....The LRE requirement shows Congress' strong preference in favor of mainstreaming....but does not require, or even suggest, doing so when the regular classroom setting provides an unsatisfactory education."[Citation omitted.] Beth B. v. Van Clay, 282 F.3d 493, 497 (7th Cir. 2002).

This language echoes an earlier finding of the Seventh Circuit in which the court stated that the LRE provision was not "developed to promote integration with non-disabled peers at the expense of other IDEA educational requirements." Board of Education of Murphysboro Community Unit School District No. 186, County of Jackson, State of Illinois v. Illinois State Board of Education, 41 F.3d 1162, 1168 (7th Cir. 1994).

Although several circuits have developed tests to assess whether a placement has been made in the lease restrictive environment, the Seventh Circuit has failed to adopt such a test. Monticello School District No. 25 v. George L. ex rel. Brock L., 102 F.3d 895 (7th Cir. 1996). In George L., the court recognized the tests set forth by other courts, but failed to adopt one. 102 F.3d at 906. One test, the Roncker test, used by the Sixth and Eighth Circuits, is based on Roncker ex rel. Roncker v. Walter, 700 F.2d 1058 (6th Cir. 1983), and requires the comparison between the benefits of an inclusive or mainstream placement and the benefits of a more restrictive placement. If the more restrictive placement

is superior, the individualized education program team must then examine whether the supports and services that make this placement better can feasibly be implemented in the regular education setting. Id.

9.      **Specific Methodology**. It is not always necessary for a district to articulate a specific methodology in an IEP in order to address the special needs of a student adequately. In T.B. v. Warwick School Department, No. CIV.A. 01-122T, 2003 WL 22069432 at *2 (D.R.I. June 6, 2003), the parents of an autistic preschooler refused to agree to the district's IEP because it failed to include a specific reference to the DTT methodology. Rather, the IEP stated that the student needed to learn in "small groups of 2-3 students or 1:1 teaching for new skills...and called for placement in a self-contained special education classroom with part-time and one-on-one instruction to be provided as needed and related services to be provided by a speech and language therapist, an occupational therapist, and the school psychologist." Id. Ruling in favor of the district, the court reasoned that "[w]hile the IDEA requires school officials to 'consider' strategies to be used in educating a handicapped child, when appropriate, it does not contain any requirement that strategies or anything else be debated at IEP meetings." 2003 WL 22069432 at *16. The T.B. court quoted the IDEA's legislative history, which states the following:

"[W]hile...methodologies or approaches are an appropriate topic for discussion and consideration by the IEP Team during IEP development or annual review, they are not expected to be written into the IEP. Futhermore, the Committee does not intend that changing particular methods or approaches necessitates an additional meeting." Id., quoting H.R.Rep. No. 95, 105th Cong., 1st Sess. (1997), 9. 101. Thus, because the district's IEP was reasonably calculated to provide an appropriate education, despite its failure to reference the DTT approach, it was upheld. In the case at hand the Plaintiffs allege that exhaustion of remedies would be futile because an IEP does not nor doe it have to cover programming, methodology, curriculum or structures.

10.      **Conclusion**. Under Honig v. Doe, 484 U.S. 305, exhaustion of administrative remedies is waivable where it would be futile or inadequate.  A hearing officer can order placement of each of these Plaintiffs in the private school placements they have been offered. However, each of the Plaintiffs

contend that they are still inadequate for their children. Willow Glen is only five years old. Easter Seals is one year old. They are planning in the future to have the "structure" and facility and programming that Page Park had had, but these children Plaintiffs cannot wait. All three are eighteen years old or almost. Pursuant to Colleen Cyrus, Wilson Aspire will not <u>ever</u> offer these structures or facilities. Page Park developed them over 35 years. A hearing officer has no authority to order hot lunches, to order a cafeteria setting or access to a pool that all "normal" children have access to and these children use to have at Page Park. This District should not be allowed to provide less of an educational benefit to the Plaintiffs than the general population receives. Exhaustion of administrative remedies would be futile and inadequate when there is an allegation of discrimination and denial of FAPE to the severe and profound children enrolled in District #205.


                                    CHARLOTTE K., as parent and next
                                    friend of GILLIAN K., a minor,
                                    KIMBERLY K., as parent and next
                                    friend of MATTHEW K., a minor and
                                    CAROL K., as parent and next friend of
                                    WILLIAM K., a minor,

                          BY:      /s/ Joyce O'Neill Austin
                                       JOYCE O'NEILL AUSTIN


PREPARED BY:
JOYCE O'NEILL AUSTIN #959
SHRIVER, O'NEILL, & THOMPSON
515 N. Court Street
Rockford, Illinois 61103
Tele.:  (815) 963-4896
Fax:   (815) 963-4904

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

**CHARLOTTE K.**, as parent and next friend of )    Case No.: 08-C-50115
**GILLIAN K.**, a minor, and **KIMBERLY K.**, as )
parent and next friend of **MATTHEW K.**, a )
minor, )
        Plaintiffs, )
         )
         )
v. )
         )
**ROCKFORD BOARD OF EDUCATION** )
**DISTRICT #205,** )
        Defendant. )

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS

NOW COMES the Defendant, THE BOARD OF EDUCATION OF THE ROCKFORD
PUBLIC SCHOOLS, DISTRICT NO. 205 ("District"), by and through one of its attorneys,
THOMAS J. LESTER of HINSHAW & CULBERTSON LLP, hereby moving to dismiss
Plaintiffs' Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil
Procedure.

### INTRODUCTION

GILLIAN K., WILLIAM K.[1] and MATTHEW K. are high school students with severe
and profound disabilities. The students have been enrolled in the Rockford Public Schools,
District #205 ("District"). The most recent agreed upon Individualized Education Plans ("IEP")
which have been implemented for the students indicate that they are to receive special education
and related services such as occupational and physical therapy, and adaptive physical education.
(Dkt. 12, Plaintiffs' Amended Complaint, hereinafter referred to as "Comp." ¶¶4-6). Prior to the
beginning of the 2008 summer session, the students were receiving special education and related
services at the District's Page Park facility located at 5949 Safford Road, Rockford, IL 61101.
(Comp. ¶¶11-12). At the end of the 2007/2008 school year, the special education program

---

[1]   Plaintiffs have filed a motion to add Carol K. and William K. as Plaintiffs to this suit – however, this
motion has not been properly noticed before the Court. Notwithstanding, inasmuch as the Amended
Complaint includes allegations related to William K., the District addresses these allegations and
moves to dismiss the Amended Complaint for the reasons set forth herein.



PLAINTIFF'S
EXHIBIT
A

previously housed at Page Park School was relocated to a different District facility, namely, Wilson School, 520 N. Pierpont Avenue, IL 61101 (hereinafter referred to as "Aspire"). (Comp. Ex. #1, Dkt. 12-2 p. 23 of 61 & Ex. #5, Dkt. 12-2 p. 38 of 61). Although the District is making additional structural improvements, the relocation of Aspire was effectively completed; and, on June 23, 2008, Aspire began providing services to students who qualify for extended school year services ("ESY"). (Comp. Ex. #1, Dkt. 12-2 p. 24 of 61).

Aspire – like the special education program at Page Park – is a separate facility within the statutorily mandated continuum of placement options for eligible students. Aspire has its own principal, secretary, staff, entrances, parking lot, phone service, network server, classrooms, schedule, and calendar of social, family, and community events. (Comp. Ex. #5, Dkt. 12-2 p. 38 of 61). All sensory and vocational equipment and assistive technology and equipment previously located at Page Park have been moved to Aspire. (Comp. Ex. #5, Dkt. 12-2 p. 38 of 61). All programs and services, including ESY, provided to the students who were previously assigned to Page Park are now being provided to the students at Aspire. (Comp. Ex. #5, Dkt. 12-2 p. 38 of 61). Further, Aspire has replicated the life skills apartment previously located at Page Park such that all daily living skills will now be taught in a specially designated area of Aspire. (Comp. Ex. #5, Dkt. 12-2 p. 38 of 61). Inasmuch as all of the essential services and programs which were previously located at Page Park have been relocated to the new Aspire facility and/or are available at the new Aspire facility, all of the services set forth in the IEPs of GILLIAN K., MATTHEW K., and WILLIAM K. can and are being provided at Aspire.

Plaintiffs nevertheless seek an injunction to prevent the District from completing the remaining structural alterations to the Page Park facility[2] with the intent of later seeking an order requiring the District to return the students to the Page Park facility. Plaintiffs allege that the Aspire facility is inadequate in that it does not have a canopy at the entrance, playground or outside activities, bathrooms in each classroom, "handicapped" showers, cafeteria, or a therapeutic pool, and there is no or poor access to gymnasium. (Comp. ¶59). However, the articulated reason that the Plaintiffs seek extraordinary relief is that the students will allegedly suffer irreparable harm if they do not have access to a swimming pool, playground, and bathrooms in each and every classroom. (Comp. ¶67). None of these amenities are identified in

---

[2]   The alterations at Page Park are 75% complete.

2

the Plaintiff students' IEPs as necessary to ensure the students receive a free and appropriate public education ("FAPE") and/or make progress toward their respective educational goals. (Comp. ¶64).

Plaintiffs' suit is brought in the context of the Individuals with Disabilities Education Improvement Act ("the IDEA") of 2004, 20 U.S.C. § 1400 *et seq*. Although the Complaint is organized into separately labeled sections, the only prayer for relief is located at the end of the Complaint, such that it appears that Plaintiffs have filed a single-count Complaint against the District in which they invoke the IDEA as well as the Americans with Disabilities Act of 1990 ("ADA"), §2 *et seq*.; 42 U.S.C. §12101 *et seq*., and the Rehabilitation Act of 1973, §501 *et seq*., 29 U.S.C. §791 *et seq*.; and 42 U.S.C. §1983.

## ARGUMENT

The District moves to dismiss the instant lawsuit inasmuch as Plaintiffs' Amended Complaint is defective. It is well-settled that a complaint will be dismissed if – as in this case – it appears beyond a doubt that the Plaintiffs can prove no set of facts in support of their claims entitling them to relief. *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957); *Hernandez v. City of Goshen*, 324 F.3d 535, 537 (7th Cir. 2003). The Court is not obliged to accept, as true, legal conclusions. *McLeod v. Arrow Marine Transp., Inc.*, 258 F.3d 608, 614 (7th Cir. 2001). Nor is the Court bound by Plaintiffs' legal characterization of the facts. *See, e.g., Scott v. O'Grady*, 975 F.2d 366, 368 (7th Cir. 1992). Further, as in this case, where Plaintiffs plead particulars which demonstrate that Plaintiffs do not have a claim, then Plaintiffs have pleaded themselves out of court. *Treadway v. Gateway Chevrolet Oldsmobile Inc.*, 362 F.3d 971 (7th Cir. 2004) (plaintiff pleaded himself out of court by alleging facts inconsistent with legal conclusion).

## I.    Plaintiffs have pleaded particular facts which demonstrate that Plaintiffs do not have a claim upon which relief can be granted.

Plaintiffs' Amended Complaint should be dismissed for failure to exhaust administrative remedies and because the District has not effectuated a change in the Plaintiff students' placements. The Amended Complaint of Plaintiffs KIMBERLY K. and MATTHEW K. should be dismissed for the additional reason that the District is not obligated by law to provide MATTHEW K. with any special education and related services inasmuch as he does not reside within the District's boundaries.

3

70S67549v2 890325

## A.    Plaintiffs have failed to exhaust their administrative remedies.

In the present case, Plaintiffs are seeking relief under the IDEA for alleged violations of the Act. Specifically, the Plaintiffs are asking this Court to prevent the District from removing the playground equipment and permanently closing the swimming pool at the Page Park facility.

According to the Seventh Circuit, the IDEA's exhaustion requirement is triggered when "theory behind the grievance" "deals with acts that have both an educational source and an adverse educational consequence."[3] *Charlie F. v. Board of Educ. of Skokie Sch. Dist. 68*, 98 F.3d 989, 992 (7th Cir. 1996); see also *Bayer v. Duneland Sch. Corp.*, 2006 WL 292 7597, *2 (N.D. Ind. 2006). If there is an adverse educational consequence, the court examines whether the complaint could be remedied by a change in the student's IEP. *McCormick v. Waukegan Sch. Dist. Number 60*, 374 F. 3d 564, 569 (7th Cir. 2004). The IEP, which sets forth a student's educational level, performance, goals and requisite services/amenities, is the governing document for all educational decisions concerning the student. *Board of Educ. of Comm. High Sch. Dist. #218, Cook Cty., Illinois v. Illinois State Board of Educ.*, 103 F.3d 545, 546 (7th Cir. 1996) citing *Rodiriecus L. and Betty H. v. Waukegan Sch. Dist. #60*, 90 F.3d 249, 252 (7th Cir. 1996).

Under the foregoing principles, the exhaustion requirement clearly applies to Plaintiffs' claims. Simply, whether a FAPE requires the use of a therapeutic pool (or the other amenities at issue) is (1) an educational issue, (2) which requires specialized expertise, and (3) which could be remedied by a change in the Plaintiff students' IEPs.[4]  Plaintiffs raise a host of allegations regarding the District's alleged failure to adequately assess or evaluate the Plaintiff students' needs and/or provide sufficient services. However, the Plaintiffs do not allege that they ever

---

[3]  The IDEA's exhaustion requirement serves a number of policy objectives: it allows deference to agency expertise in resolving educational matters; it gives the agency a first opportunity to correct errors; it presents courts with a more fully developed record; and it prevents parties from deliberately disregarding the statute's comprehensive procedures and remedies. See, e.g., *Charlie F.*, 98 F.3d at 992-93; *Bills v. Hommer Cons. Sch. Dist. No. 33-C*, 959 F. Supp. 507, 511-13 (N.D. Ill. 1997). As the Seventh Circuit explained, "educational professionals are supposed to have at least first crack at formulating a plan to overcome the consequences of educational shortfalls." *Charlie F.*, 98 F.3d at 992.

[4]  Plaintiffs allege that there are certain children at Page Park (but not Plaintiffs' children) whose IEPs required a pool in the 2007-2008 school year. (Comp ¶¶4-6, 56). This, of course, is not relevant because that allegation does not involve any of the Plaintiffs.

4

requested the District to convene an IEP meeting to discuss these concerns or that the District failed and refused to convene an IEP meeting to review these issues. Plaintiffs also do not allege that the requested amenities are necessary for the Plaintiff students to receive a FAPE or that it would be futile to raise such arguments before a state-appointed hearing officer. In fact, they have done just that in their requests for due process hearings. Accordingly, they have failed to exhaust their remedies available in the IEP process. *Bell v. Anderson Comm. Schs.*, 2007 WL 2265067, *8 (S.D. Ind. 2007) (denying relief under IDEA where the Plaintiffs had not gone through the IEP process with respect to the educational needs which they claim were not being addressed).

Plaintiffs also have failed to exhaust their administrative remedies because they filed the instant lawsuit before their due process hearings could proceed. On or about June 24, 2008, the Plaintiffs filed separate administrative due process complaints against the District. (Comp. ¶24; Ex. ##2-4, Dkt. 12-2, pp. 27-35; Ex. A, Dkt. 12-2, pp. 45-47; Ex. B, Dkt. 1202, pp. 59-61). In their administrative due process complaints, Plaintiffs seek an order which requires the District to place Plaintiffs at Page Park or at a facility equivalent to the Page Park facility. *Id.* Yet, they filed their federal court lawsuit on June 24, 2008, before these hearings could be held seeking similar relief.

As in this case, where a plaintiff requests a due process administrative hearing, but then files an action in federal court before the hearing occurs, the case is properly dismissed for failure to exhaust administrative remedies. *J.C. ex rel. Cooper v. North Harrison Cty. Comm. Sch. Corp.*, 2005 WL 280340, *2 (S.D. Ind. 2005) (granting school district's motion to dismiss where plaintiff filed an administrative due process complaint under the IDEA less than a week before filing a federal court complaint and before the due process hearing occurred).

### B.     *Plaintiffs are not excepted from exhausting their administrative remedies.*

Plaintiffs' claims do not satisfy any of the three exceptions to the exhaustion requirement. The three exceptions are when the administrative remedies are futile, inadequate, or when plaintiffs allege "structural or systemic failure and seek systemwide reforms." *Association for Comm. Living in Colorado v. Romer*, 992 F.2d 1040, 1043 (10th Cir.1993). To fall into the third exception, the District must have adopted a policy of general applicability contrary to law which "thereby renders agency expertise and the factual development of an administrative record less

5

important." *Ass'n for Comm. Living*, 992 F.2d at 1044. In this case, administrative relief would not have been futile or inadequate.[5]

Citing to *Honig v. Doe*, 484 U.S. 305 (1988), Plaintiffs acknowledge that they are required to exhaust their administrative remedies, but nevertheless allege that the administrative process would be "futile or inadequate" inasmuch as the District has moved the students to a new facility and plans to "destroy millions of dollars of therapeutic equipment" (i.e., the swimming pool and playground equipment) which is located at Page Park School. (Comp. ¶¶54-55). This argument is unavailing inasmuch as the Plaintiff students' IEPs did not include any reference to the swimming pool and there is no allegation that the "therapeutic equipment" which Plaintiffs allege will be destroyed is otherwise included in the Plaintiff students' IEPs.

Even though it is undisputed that the Plaintiff students' IEPs did not include any reference to the swimming pool, nature trail, garden, or playground, and did not specify that Plaintiffs were to be placed at Page Park, the Plaintiffs nevertheless ask this Court to make a determination without the benefit of an administrative record that these amenities are essential for the Plaintiff students to receive a FAPE. However, this is the issue that is currently before an administrative hearing officer. That is, as indicated in the Plaintiffs' administrative complaints, the Plaintiffs are asking the hearing officer to review whether the Plaintiff students' disabilities required specific services/amenities and, if so, whether such services could be provided at Page Park, Aspire, or another location.

In the effort to avoid the results of this failure to exhaust, Plaintiffs also allege that the District has been "systematically depriving" Page Park students by: (1) removing references to the swimming pool, walking paths, playground, and garden from students' IEPs and otherwise decreasing special education programming and curriculum of the students at the Page Park special education facility; (2) providing the written IEP document to the parent "days after" the

---

[5]    In determining whether administrative remedies would be futile, the court must look to the "theory behind the grievance." *McCormick*, 374 F.3d at 568-69. "[I]f the Plaintiff has alleged injuries that cannot 'be redressed to any degree by the IDEA's administrative procedures and remedies,' then it would be futile to exhaust, and the disabled individuals can bring their disputes directly to court." *Id.*, quoting *Padilla v. School District No. 1*, 233 F.3d 1268, 1274-75 (10th Cir. 2000). In the *McCormick* case, for example, exhaustion of remedies was held to be futile because the nature of the injury was a permanent physical injury which was not educational in nature and which accordingly was found to not be subject to the IDEA's exhaustion requirement.

6

IEP meeting; (3) implementing a computerized IEP program which allows users to select IEP services/goals from a check list and which requires any additional services/goals to typed or handwritten on the form; (4) over the course of three years, gradually moving students from Page Park to other locations and "mainstreaming" these unidentified students, i.e., placing the students in regular classes alongside their non-disabled peers with appropriate aids and supports. (Comp. ¶¶40-46, 56-58). In addition, Plaintiffs allege that the facility to which the Plaintiff students have been moved is "inadequate" in that (1) it does not have a canopy to protect the arriving students during inclement weather, a playground or outside activities, bathrooms in each classroom, a cafeteria, or a therapeutic pool; (2) there is no or poor access to a gymnasium; and, (3) there is a dead bolt on the exit door. (Comp. ¶58).

None of the allegations implicate a systemic violation of the IDEA's mandates. Nor do Plaintiffs identify any district-wide policy of discrimination against disabled students. Indeed, there is nothing in the IDEA that requires school districts to *place* students at locations with swimming pools, gardens, playgrounds, or walking trails. While the IDEA requires school districts to provide a FAPE, there is nothing in the IDEA that prohibits school districts from decreasing or changing services to students with disabilities commensurate with their identified needs. The IDEA does not require school districts to provide a copy of the IEP to the parent at the time that the IEP is reviewed or modified.[6] The IDEA also does not prohibit the use of computer programs which allows users to select goals/services from check lists.

In addition, not only does the IDEA not prohibit "mainstreaming," it expresses a strong preference for educating children with disabilities in regular classes alongside their non-disabled peers with appropriate aids and supports. 20 U.S.C. §1412(a)(5). This principle, known as least restrictive environment, requires each public agency to ensure that, to the maximum extent appropriate, children with disabilities, including children in public or private institutions or other

---

[6]   In Illinois, when an IEP has been developed or revised, a notice must be provided immediately to the parents, and implementation of the IEP must occur no later than 10 days after the provision of this notice. 23 Ill. Admin. Code 226.200(a). The purpose of notice provisions such as this is to ensure the parent understands the content and terms of the IEP to be implemented. In this case, the Plaintiffs admit that they attended the IEP meetings as demonstrated by their signatures and that they received copies of the IEPs within "days:" of the IEP meetings. (Comp. ¶44). To the extent the Plaintiffs did not believe the typed document accurately reflected the consensus of the IEP team or to the extent the Plaintiffs otherwise disagreed with the IEP, they could have and should have notified the District to request that the District correct the errors, reconvene the IEP team and/or file for due process.

7

care facilities, are educated with children who are not disabled. Special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs *only* if the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily. 20 U.S.C. §1412(a)(5); 34 CFR §300.114(a)(2). School districts are therefore required to have available a continuum of alternative placements, ranging from services in regular classes to separate classes, separate schools and even residential programs. 34 C.F.R. §300.115. It is incongruent that Plaintiffs' primary allegation involving systemic violations is that the District is complying with the law by placing students in the least restrictive environment.

Plaintiffs have not cited any statute, regulation, or case law in support their claim that the above allegations were violative of the IDEA. Plaintiffs nevertheless claim that they are not required to exhaust their administrative remedies under the IDEA because such action would be futile. In support of their request Plaintiffs cite to *J.S. v. Attica Cent. Schs.*, 386 F.3d 107, 113 (2d Cir.2004). Unlike the instant case, the plaintiffs in *Attica*, alleged that there was a total failure on the part of the school district to prepare and implement IEPs, to provide the parents with student progress reports, as well as the statutorily mandated notifications of meetings and procedural safeguards, and to perform timely evaluations and reevaluations of disabled students. *Id.* In *Attica*, then, there was a total failure to comply with the *procedural* mandates of the IDEA, such that the students did not receive a FAPE. In determining whether the *Attica* plaintiffs were required to exhaust administrative remedies, the court reviewed several cases in which plaintiffs were excused from the exhaustion of administrative remedies under the systemic violation exception. Each case, however, involved allegations of systemic violations of the IDEA or structural concerns with the State or school district educational system. This case involves neither.

The factual allegations in this case are solely directed at the District's decision to move the Plaintiff students from one separate special education facility to another and the particularized concerns about the services contained in the Plaintiff students' IEPs, not because of some systemic or structural concern with the education of handicapped children in the State or the District. In fact, Plaintiffs do not seek to remedy any alleged systemic concern. Rather, the requested relief is specific to the Plaintiffs; namely, Plaintiffs seek an order returning the Plaintiff students to the Page Park facility. Thus, although Plaintiffs make the conclusory

8

allegation that "systemic" violations have occurred, the facts alleged in the Amended Complaint are inconsistent with Plaintiffs' legal conclusion.

The IDEA specifically leaves the initial determinations of such claims of wrong-doing to administrative decision-makers. 20 U.S.C. §§1415(b)-(i). The issue as to whether, given the Plaintiff students' disabilities, their FAPE requires additional services or amenities or requires access to Page Park's therapeutic pool, therapeutic playground, etc., is educational in nature and falls squarely within the purview of the IDEA, its procedures, and remedies. If Plaintiffs wish to challenge the Plaintiff students' educational program and placement, they may do so by requesting an administrative due process hearing. If the Plaintiffs are dissatisfied with the administrative ruling, then they may seek relief from the federal district court. 20 U.S.C. §1415(i)(2). Accordingly, Plaintiffs cannot invoke any exception to the exhaustion doctrine.

Therefore, the Court should dismiss Plaintiffs' complaint and require Plaintiffs to exhaust their administrative remedies. To hold otherwise would be contrary to the explicit language of the statute and well-settled case law and would undermine the purposes of the exhaustion requirement.

## C.   *Plaintiffs are required to exhaust their administrative remedies prior to bringing suit under the ADA, Section 504 of the Rehabilitation Act, or Section 1983.*

In *Charlie F. v. Board of Educ. of Skokie Sch. Dist. 68*, the Seventh Circuit ruled that when a party seeks in a claim under some other federal statute, including §1983, relief for a state of affairs that is actionable under the IDEA, he must exhaust administrative remedies, consistent with the IDEA's requirements. 98 F.3d 989, 992-93 (7th Cir.1996). "[P]arents [cannot] opt out of the IDEA by proclaiming that it does not offer them anything they value" or by claiming only damages. *Id.* at 993. If "the genesis and the manifestations of the problem are educational" and of the type covered by the IDEA, then the claim amounts to a claim for relief available under the IDEA. *Id.*

As discussed above, the genesis and manifestations of the problem in this case are educational. Indeed, the allegations set forth in the federal complaint are identical to those set forth in the administrative due process complaints. Therefore, Plaintiffs' Amended Complaint should be dismissed.

9

### D.    The District has not effectuated a change in Plaintiff students' educational placement.

Plaintiffs are unable to show a violation of stay-put. Section 1415(j) of the IDEA provides that, unless agreed otherwise, students are to remain in their "then current educational program" pending the resolution of the special education disputes with their schools. 20 U.S.C. §1415(j). This is commonly referred to as the "stay-put" placement. The purpose of stay-put is to maintain the status quo pending resolution of the due process hearing. *Board of Educ. of Oak Park and River Forest High Sch. Dist. 200 v. Illinois State Bd. of Educ.*, 79 F.3d 654, 657 (7th Cir 1996).[7]

Courts and hearing officers have consistently determined that the "then current educational placement" for purposes of stay-put is the IEP which has been implemented at the time the due process is received. *See, e.g., Rodiriecus v. Waukegan Sch. Dist. No. 60*, 889 F.Supp. 1045, 1049 (N.D. Ill. 1995), *rev'd on other grounds*, 90 F.3d 249 (7th Cir. 1996) ("If an IEP has been implemented, then that program's placement will be the one subject to the stay put provision."); *Thomas v. Cincinnati Bd. of Educ.*, 918 F.2d 618, 624-26 (6th Cir. 1990); *Norman v. St. Anne Cmty. H.S. Dist. No. 302*, 2004 WL 3246973 at *3 (C.D. Ill. August 13, 2004); *Hinsdale Comm. Consolidated Sch. Dist. 181*, 103 LRP 14496 (Hearing Officer Smaron, 2002) (adopting the standard that the stay put placement is the IEP placement that was implemented); *Will Cty. Sch. Dist. No. 92*, 35 IDELR 231 (Hearing Officer Cook, 2001) ("Once the IEP is actually implemented, then the IEPs placement becomes the placement for stay put purposes.").

In this case, the current IEPs of the Plaintiff students do not require the special education and related services to be provided at the Page Park facility. Nor do the IEPs require that the District provide the students with a swimming pool, garden, playground, or nature trail. (Comp. ¶64). The District is providing the requisite services as set forth in the Plaintiff students' IEPs. Plaintiffs make no allegation to the contrary.

---

[7]    The implementation of stay-put is an "inexact science" that depends on the context and facts of each case. *Board of Educ. of Comm. High School Dist. 218 v. Illinois State Bd. of Educ.*, 103 F.3d 545, 548-49 (7th Cir. 1996). Typically, "then-current educational placement" for disabled students refers to the student's general educational program. *Id.* at 548. Further, "then-current educational placement" has been interpreted in the Seventh Circuit to mean "something more than the actual school attended by the child and something less than the child's ultimate educational goals." *Id.* at 549. In arriving at this definition, the Seventh Circuit relied upon the decision issued by the Second Circuit in *Concerned Parents and Citizens v. New York Board of Educ.*, 629 F.2d 751 (2d Cir. 1980).

The fact that the amenities at issue are not contained in the Plaintiffs' IEPs means that stay put relief is not even contemplated in this situation. *J.C. ex rel. Cooper*, 2005 WL 280340, *2 (stay put relief was not available where Plaintiffs' Complaint sought a new educational program that was not part of their IEP). "The IEP, which sets forth the child's educational level, performance, and goals, is the governing document for all educational decisions concerning the child." *Board of Educ. of Comm. High Sch. Dist. #218, Cook Cty., Illinois v. Illinois State Board of Educ.*, 103 F.3d 545, 546 (7th Cir. 1996), citing *Rodiriecus L. and Betty H. v. Waukegan Sch. Dist. #60*, 90 F.3d 249, 252 (7th Cir. 1996). Accordingly, Plaintiffs have no right to seek stay put relief in the district court because the amenities on which their "change in educational placement" complaint is based were never part of their agreed upon educational program as reflected in the IEP.

Similar to the instant case, in *Concerned Parents and Citizens v. New York Board of Educ.*, 629 F.2d 751 (2d Cir.1980), the school district had transferred special education students from one building, in which the special education students comprised a majority and received an "extremely innovative educational program," to other buildings in the district, in which they were then a minority. Nevertheless, the Second Circuit held that the action of the school district did not constitute a change in "educational placement" which would trigger due process duties, even though the classes in the new schools varied in some respects from the unusual program available at the former school. *Id.* at 756. The Court construed the term "educational placement" to refer "only to the general educational program in which the disabled child is placed and not to all the various adjustments in that program that the educational agency, in the traditional exercise of its discretion, may determine to be necessary." *Id.* In this case, unlike the situation in *Concerned Parents*, there has been no change in any of the students' general educational programs.

In *White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 379 (5h Cir. 2003), the Fifth Circuit addressed an analogous case, in which the parents sought to require the school district to place their deaf child in a mainstream classroom in a neighborhood school. The Court held that the parents did not have a right under the IDEA to participate in site selection, because the term "educational placement" referred not to a place, but to a program of services. *Id.*

Here, the record reflects that the District is offering the same program and services albeit in a different facility. All of the services contained in the Plaintiff students' IEPs continue to be

11

provided on a daily basis. Likewise, all of the sensory and vocational equipment and all of the assistive technology and equipment which was previously located at Page Park has been moved to Aspire. (Comp. Ex. #5, Dkt. 12-2 p. 38 of 61). Any changes resulting from the move to the new facility are inconsequential and far more minimal than those involved in *Concerned Parents* and *White*. Accordingly, Plaintiffs are unable to show that the District has violated stay-put, and their request for injunctive relief should be denied as a result.

**II.**    **Inasmuch as Plaintiffs KIMBERLY K. and MATTHEW K. do not reside in the District's boundaries, the District is not obligated by law to provide special education and related services to MATTHEW K. Therefore, the suit brought by KIMBERLY K. and MATTHEW K. should be dismissed.**

KIMBERLY K. affirmatively represents to the Court that she is the guardian of MATTHEW K. (Comp. ¶5). KIMBERLY K. likewise represents that she resides in Naperville, Illinois. (Comp. ¶8). Under the *Illinois School Code*, the school district of residence is responsible for the delivery of special education services either directly or pursuant to an alternative arrangement, at no cost to the student or parents, absent parents having taken some unilateral action. Because the District is not the resident district for MATTHEW K., it is not obligated by law to provide special education and related services to MATTHEW K. Therefore, inasmuch as the District is not a proper party to this action, the District should be dismissed.

Illinois law assigns responsibility for special education services to the school district where the student resides.[8] 105 ILCS 5/14-1.11, 5/14-6.01 and 14-7.01; 23 Ill.Admin.Code §226.700; *see also*, 23 Ill.Admin.Code §240.25 ("[t]he district of residence shall ensure that the student receives all of the special education and related services listed in his or her IEP . . . [t]he student's district of residence remains responsible for ensuring that the IEP is fulfilled"). In many, if not most circumstances, for special education purpose, the residence of one or both parents determines student residence. 105 ILCS 5/14-1.11 and 14-1.11a. This remains true after a student with disabilities reaches the age of majority if the parents have obtained legal

---

[8]    States are required to provide special education and related to services to eligible students residing within their borders. 20 U.S.C. §1412. The IDEA does not dictate how to determine whether a child, parent, or guardian is or is not a "resident" of a state or school district. Rather, the IDEA leaves to the states the assignment and allocation of financial responsibility for special education cost, the definition of "residency" and the choice as to whether to provide a free and appropriate public education to children who may not be considered "residents" under state law, in addition to those whose residency is not an issue.

12

guardianship of the person, which Plaintiffs admit is the case regarding MATTHEW K. *Id.* at 5/14/1.11(1).

"When a student's resident school district is unable to meet the student's disability needs, the student is eligible to receive educational services elsewhere." *In re D.D.*, 212 Ill.2d 410, 421, 289 Ill.Dec. 143, 819 N.E.2d 300 (Ill. 2004), *citing* 105 ILCS 5/14-7.01, 14-7.02 (West 1998). The obligation of the resident district to ensure a special education eligible student's educational program and services are provided to the parent at no cost remains true for students when they are placed by the resident district in another public education facility, as in this case. 105 ILCS 5/14-7.01. To the extent a parent is unhappy with the special education services received by the student in his or her special education placement or pursuant to his or her IEP, one avenue open to the parent is to file a request for due process against his resident school district. 105 ILCS 5/14-8.02a(f). Section 14-8.02a(f) of the *School Code* provides, in relevant part: "An impartial due process hearing shall be convened upon the request of a parent. . . A request made by the parent or student shall be made in writing to the superintendent *of the school district where the student resides.*" (Emphasis added). There is no legal authority for the parent to file the request against another public school district who is not the resident district, even if the non-resident district has agreed to provide the services because the resident district cannot.

In the present complaint, KIMBERLY K. admits that she is a resident of the City of Naperville. Pursuant to Illinois law, then, the responsible school district is Indian Prairie District #204 – which is the school district in which the guardian of Matthew resides. 105 ILCS 5/14-1.11 and 14-8.02a(f). *See also, e.g., Board of Educ. of Comm. Unit Sch. Dist. No. 428 v. Board of Educ. of High Sch. Dist. No. 214*, 680 N.E.2d 450, 288 Ill.App.3d 382, 223 Ill.Dec. 717 (2nd Dist. 1997). Therefore, the Amended Complaint of KIMBERLY K. and MATTHEW K. should be dismissed with prejudice.

## CONCLUSION

Inasmuch as the District is not a proper party to the action brought by Plaintiffs KIMBERLY K. and MATTHEW K, the District should be dismissed with prejudice. Further, inasmuch as Plaintiffs have pleaded particulars which demonstrate that Plaintiffs do not have a claim, the Amended Complaint should be dismissed, and Plaintiffs should be barred from refiling another complaint until and unless Plaintiffs exhaust their administrative remedies.

13

70567549v2 B90325

WHEREFORE, the Defendant, THE BOARD OF EDUCATION OF THE ROCKFORD PUBLIC SCHOOLS, DISTRICT NO. 205, respectfully requests that this Court dismiss Plaintiffs' Amended Complaint with prejudice, and for such other and further relief as this Court deems just and appropriate.

Respectfully submitted,

HINSHAW & CULBERTSON LLP

Thomas J. Lester
Hinshaw & Culbertson LLP
100 Park Avenue
P.O. Box 1389
Rockford, IL 61105-1389
815-490-4900

By: s/Thomas J. Lester

Thomas J. Lester

14

70567549v2 890325

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

CHARLOTTE K., as parent and next friend )
of GILLIAN K., a minor, and KIMBERLY )
K., as parent and next friend of MATTHEW )
K., a minor, )
      Plaintiffs, )
                                )
                                )
v. )   Case No.: 08-C-50115
                                )
ROCKFORD BOARD OF EDUCATION )
DISTRICT #205, )
      Defendant. )

### AFFIDAVIT OF COLLEEN CYRUS

I, Colleen Cyrus, being first duly sworn on oath, do hereby attest to the following, based upon my personal knowledge, and would testify in a court of law:

1.    I am the Assistant Superintendent of Rockford Public Schools, District #205 ("District").

2.    I possess a Type 75 general administrator's certificate with an endorsement as a State Certified Director of Special Education. I also possess a LBS1 Teaching Certificate which allows me to teach pre-kindergarten through high school students in all disability categories – except for hearing and vision impaired students.

3.    I was hired by the District in 1989 as a special education teacher. In 1994, I was promoted to the position of Special Education Supervisor. In 2004, I was promoted to the position of Director of Special Education of the Rockford Public Schools, District #205. Thereafter, in October 2007, I was promoted to the position of Assistant Superintendent.

4.    I have supervisory responsibility for overseeing the provision of special education and related services within the District, including Special Education due process and complaint proceedings.

EXHIBIT

A



PLAINTIFF'S
EXHIBIT
B

5.     As part my duties, I am authorized to certify and/or testify concerning the District's Special Education policies and procedures as well as its record-keeping procedures, including customary practices and the completeness, accuracy and/or authenticity of any original or copy of a record as such records relate to Special Education matters.

6.     The former Page Park Program for students with disabilities is now called the Aspire Program.

7.     The Aspire Program was previously located at the District's Page Park facility, 5949 Safford Road, Rockford, IL 61101.

8.     At the end of the 2007/2008 school year, the Aspire Program was relocated to a different District facility, namely, Wilson School, 520 N. Pierpont Avenue, IL 61101. A true and correct copy of the layout of the Aspire Program at Wilson School is attached hereto as Exhibit A. Although the District is making additional structural improvements, the relocation of the Aspire Program has been effectively completed; and, on June 23, 2008, the Aspire Program began providing services to students enrolled in Summer School.

9.     The principal, teachers, and staff who were previously assigned to the Page Park facility have been relocated to the Aspire Program at Wilson School.

10.     Concurrently, programs have been moved from other facilities into the Page Park facility; these moves have involved construction/technology projects as well as the moving of equipment, furniture, textbooks, supplies, etc. In fact, there have been a series of programs that have been relocated which impact the assignment of hundreds of students. Significant planning and remodeling was involved in the program relocations. The District would not be able to return all of the programs to their prior facilities prior to the start of the 2008/2009 school year.

2

11.     The Page Park facility has approximately 24 classrooms and has a special education student capacity limit of 240. The maximum number of special education students that have been in attendance at Page Park since 1994 is 140.

12.     The Aspire Program facility at Wilson School has 13 classrooms (plus a gymnasium) and has a student capacity limit of 130.

13.     Over the years, the enrollment in the Aspire Program has declined due to the federal and state mandates requiring school districts to ensure students are placed in the least restrictive environment. The parents of the students who were moved in order to meet the least restrictive environment requirements of the IDEA have not complained or filed due process; the placement and programs of these students continue to be monitored to ensure that the students make progress.

14.     Thus, during the 2007/2008 school year, there were a total of 41 students enrolled in the Aspire Program at the Page Park facility, of whom 31 resided within the District's boundaries; the remaining 10 students were residents of other school districts. Only 32 students are presently enrolled in the Aspire Program.

15.     The decision of the District to relocate the Aspire Program was based upon a recommendation made by the Education Committee based upon the Committee's analysis of the current programs and the effective use of building space.

16.     The Auburn Freshman Campus Program is also located at Wilson School. However, although the two programs are located under the same roof, the programs are housed in distinct, secure locations within the building. Thus, the Aspire Program and Auburn Freshman Campus program facilities have separate entrances and exits, transportation facilities, and restrooms.

3

17.    Moreover, the Aspire Program and Auburn Freshman Campus program have separate administration, teaching faculty, and curriculum; and, there are no program overlaps. They function as entirely separate facilities.

18.    Contrary to Plaintiffs' allegations, students are not locked in their classrooms.

19.    When students at the Aspire Program are dropped off for bus transportation, they will walk or be assisted otherwise from the curb to the front door of the Aspire Program, which is estimated to be approximately 25 to 30 feet – and is a comparable distance as that at the Page Park facility. The Page Park facility covered drop off area was in existence when the program moved into that building and was not designed specifically for students with disabilities.

20.    Auburn Freshman Campus students cannot access the Aspire Program classrooms or other facilities from the Auburn Freshman Campus portion of the building, as the only internal door which provides access to the Aspire Program classrooms and facilities has a magnetic lock which can only be unlocked with a key – unless there is a fire, in which case, all of the magnetic doors at Wilson School will automatically unlock.

21.    During inclement weather, Aspire Program teachers/staff may escort the students through one hallway of the Auburn Freshman Campus to an elevator in order to access the lower gymnasium, which is reserved solely for the Aspire Program students. Notwithstanding, Aspire Program students will only be permitted to use the hallway of the Auburn Freshman Campus at times when the Auburn Freshman Campus students are in classes. Otherwise, the Aspire Program students may access the gym from its external entrance, which is located on the ground level.

4

22.     The Page Park facility did not contain any elevators. With the exception of the lower gym, all of the Aspire Program classrooms and amenities are located on the first floor such that an elevator is not necessary. Plaintiffs' allegations to the contrary are not true.

23.     At the Aspire Program, students have an Adaptive Physical Education program with a dedicated Adaptive Physical Education instructor assigned to the Aspire Program, just as at Page Park. In addition to the gymnasium, there is one classroom on the same level as other classrooms in the Aspire Program that has been converted into an all-purpose room.

24.     All sensory and vocational equipment located at Page Park has been moved to the Aspire Program. The District will continue to have separate spaces for these services with appropriate equipment for use with students.

25.     All assistive technology & equipment particularly designed for students located at the Page Park facility has been transferred to the Aspire Program and is fully operational. Plaintiffs' allegations to the contrary are not true.

26.     The therapeutic pool at the Page Park facility has not been maintained or used in over a 12 month period, as no student has needed or currently needs a therapeutic pool in order to receive free appropriate public education. In fact, even when the pool was operational, the majority of the students did not use the pool. Further, none of the Individualized Education Plans of the students who are enrolled in the Aspire Program include any requirement that they receive services in a pool or a "therapeutic" pool.

27.     The pool at Wilson School is presently not available for any student to use and is not intended to be repaired for such use. To the extent a need arises in the future to provide hydro-therapy as part of an IEP, the District has alternative options for meeting the needs of the Aspire Program students, such as installing a whirl pool; outsourcing the service, at District

5

expense; providing the student with an alternative placement; transporting the student to an alternate location within the District for such services (inasmuch as all of the pools within the District have wheel chair lifts and some are heated). The decision would be made on a case by case basis.

28.    The kitchen at the Page Park facility provided students access to a stove, refrigerator and sink. The kitchen/cafeteria at the Aspire Program is currently under construction and will contain a three-compartment sink, new cabinets and cupboards, a stove, a refrigerator/freezer, a washer/dryer, a laundry tub, tables with table cloths and curtains to create café like environment. Thus, to the extent students require life training skills, those needs will readily be met. It is anticipated that the kitchen area will be available within the next few weeks.

29.    Likewise, the Aspire Program has replicated the life skills building opportunities such that there is a room that mirrors a house with a bedroom, living room and dining area to facilitate teaching kids how to make their bed, put clothes away, and practice eating. This room is actually larger than the life skills room at the Page Park facility.

30.    The playground at the Page Park facility was wheelchair accessible and the District has no intent to demolish playground equipment. Currently the District is seeking to move the equipment to places where other children with disabilities can benefit from the equipment, and no final decisions have yet been made.

31.  .  At the Aspire Program, the District is developing an outside physical activity area on a side of the building where wheelchair and other physical activities can take place. This activity area will be for the exclusive use of the Aspire Program students. There are also plans to upgrade and develop the current nature trail that is presently adjacent to the physical activity area, but has not been maintained for student use in the past. No "playground" area is intended

6

at the Aspire Program as students are high school aged students and a playground for their age and skill level is inappropriate. Students have alternate opportunities to engage in age appropriate recreational and physical activity, e.g. Adaptive Physical Education classes, and use of an all-purpose room.

32.    In addition, the Aspire Program students will have opportunities for outside contacts to the same extent that they had at Page Park by virtue of participation in community outings.

33.    Diaper changing at the Aspire Program does not occur in the open classroom. Rather diaper changing occurs in the designated changing areas which are enclosed, providing privacy and sanitary conditions for the student. Contrary to Plaintiffs' allegations, the hand-sanitizer contained in the classrooms is not meant to be used in lieu of washing the hands of staff or students. Rather, the hand-sanitizer is an additional measure which has been implemented to prevent the spread of germs.

34.    At the Page Park facility, restrooms were located in some of the classrooms, but not all of the classrooms. The sinks/restrooms located at the Page Park facility were installed for the purpose of convenience when there were a larger number of students participating in the program. However, for over 20 years, the District has successfully placed students with severe and profound disabilities throughout the District in classrooms which do not contain sinks or bathrooms.

35.    Restrooms at the Aspire Program are sufficient to meet the needs of the students and meet accessibility requirements under State and Federal laws, and all applicable life/safety code requirements related to toileting. The restroom facilities include stalls, urinals (in the boys' restroom), sinks, and they are wheelchair accessible.

7

36.     The Aspire Program students are taken away from their activity to address toileting activities whether or not there is a bathroom in a classroom or down the hall. Aides and other staff are available to accompany the students and assist them in the bathrooms such that the students remaining in the classroom are not left unsupervised. Staff regularly works with students on appropriate bathroom etiquette and skills throughout the District, as needed, without access to classroom specific bathrooms, as students need to learn appropriate toileting etiquette in a community bathroom such as are available at the Aspire Program. Additionally, a handicapped accessible shower has been installed for student use as needed.

37.     At the Aspire Program, there is no need for use of a key in a deadbolt to exit the building. The building door security is the same as that of all District buildings, including that located at the Page Park facility. The doors are locked from the outside with a buzzer and camera for entrance. Any party can exit without obstruction with the use of push handles, not door knobs. All entrance and exit routes at the Aspire Program meet fire code and State and Federal accessibility standards.

38.     The facility at the Aspire Program is appropriate to meet the needs of the students assigned to the building location. Page Park initially was not designed for students with disabilities either, and the Page Park program utilized both the existing and then extended portions of the building.

39.     I have reviewed the Special Education files of the students named in the instant lawsuit. The Plaintiff parents participated in Individualized Education Program meetings and had the opportunity to provide meaningful input into the resulting Individualized Education Plans ("IEPs").

8

40.     Specifically, Charlotte K. was notified in early January 2008 that her daughter's Individualized Education Plan ("IEP") was to be discussed and reviewed on January 17, 2008. Charlotte K. was present at the agreed upon January 17, 2008 IEP meeting and participated in the review and revisions to the IEP. During the meeting, the relocation of the Aspire Program was discussed; and, the IEP reflects that the "Parent expresse[d] concerns for safety and well being of [the student] in another building besides Page Park School." Notably, the agreed upon IEP does not include any requirement to provide a therapeutic playground, therapeutic nature trail, therapeutic pool, bathrooms in every classroom. Rather, the agreed upon IEP requires educational services, speech/language services, occupational therapy, and adapted physical education. The IEP does not identify the manner or methodology to be used in providing the related services (i.e., speech/language, occupational therapy, adapted physical education). All of the services set forth in the student's IEP were implemented immediately following the January 17, 2008 IEP meeting. These services can, are, and will continue to be provided at the Aspire Program.

41.     Kimberly K. was notified and participated in the development of her child's successive Individualized Education Plans ("IEP"). As documented in the IEP – which was provided to the parent – on January 24, 2007, Kimberly K. was present when the IEP team discussed transitioning her son, Matthew K., "to a less restrictive placement for the 2008 school year instead of waiting until the 2009 school year when the Page Park program is scheduled to close." Kimberly K. was also present on February 21, 2008 when her son's IEP was again reviewed and revised. Notably, the agreed upon IEP does not include any requirement to provide a therapeutic playground, therapeutic nature trail, therapeutic pool, bathrooms in every classroom. Rather, the agreed upon IEP requires educational services, speech/language services,

9

and occupational therapy.    The occupational therapy service is directed at addressing development of functional hand skills for classroom, self-help, and vocational fine motor tasks. All of the services set forth in the student's IEP were implemented immediately following the February 21, 2008 meeting. These services can, are, and will continue to be provided at the Aspire Program.

42.    The District continues to implement the Plaintiff students IEP placement decisions. They are placed in a separate public facility albeit in a different location within the District.

43.    The District has implemented rules and policies in conformance with federal and state statutory mandates. A change in physical location does not equate to a change in the educational placement of a student.

44.    The 2007/2008 progress reports for the Plaintiff students reveal that the Plaintiff students have making adequate progress toward the goals outlined in their respective IEPs, including all social/emotional goals.

45.    The transition from Page Park to the Aspire Program was on the Board agenda in February, 2008 and in March, 2008 for discussion and was included in the Board minutes. In addition, the transition has been discussed at subsequent Board meetings.

46.    The facilities at the Aspire Program for meeting the needs of the students of the Aspire Program are superior to the Page Park Program.

FURTHER AFFIANT SAYETH NOT.

Colleen M Cyrus
Colleen Cyrus

10

70566340v1 747879

SUBSCRIBED and SWORN to before me
this ____ day of June, 2008.

_____
Notary Public

Official Seal
Christine Kuhn
Notary Public State of Illinois
My Commission Expires 07/23/08

HINSHAW & CULBERTSON LLP
100 Park Avenue
P.O. Box 1389
Rockford, IL 61105-1389
(815) 490-4900

11

70566340v1 747879

