**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

CHARLOTTE K., as parent and next )
friend of GILLIAN K., a minor, )
KIMBERLY K., as parent and next )
friend of MATTHEW K., a minor and )
CAROL K., as parent and next friend of )
WILLIAM K., a minor, )
                Plaintiffs, )   08-C-50115
                          )
        vs. )
                          )
ROCKFORD BOARD OF EDUCATION )
SCHOOL DISTRICT #205, )
                          )
        Defendant. )

## <u>MEMORANDUM</u>

TO:        Judge Kapala

FROM:     Attorney for Plaintiffs, Joyce O'Neill Austin

RE:        Request for copy of <u>Letter to Fisher</u>, 21 IDELR 992 (OSEP 1994).

     In my Response Brief to the Issue of Exhaustion of Administrative Remedies. I referred to <u>Letter to Fisher</u>, 21 IDELR 992 (OSEP 1994). I do not have access to the letter itself, but it has been referred to many times in the case law and in various Due Process filings. It is used as a basis to define a change of placement and as a way to determine if a school district's change in location of a school or a program is appropriately reviewed in a Due Process Hearing. See attached cites and case law.

     In the case at hand, District #205 contends that by moving the Plaintiff children there is no change in programming/curriculum so a Due Process Hearing would be futile or inadequate. The case law supports that. Therefore, there is no need to exhaust administrative remedies. We acknowledge we cannot pick a location, but the same opportunities must be available.

We are in Federal Court because of discrimination against these severe and profoundly handicapped children. We contend District #205 has chosen to reduce these handicapped children's "regular" schooling opportunities that are available to "regular" children in District #205. In other words, there is disparate treatment that amounts to discrimination against the handicapped and it has been systematically done allegedly by removing modifications and programming from all of these children's I.E.P.'s. Our Due Process Request will give each child more individual therapy, but it will not be able to give them what other high school children have at Auburn Freshman Campus or at Auburn.

CHARLOTTE K., as parent and next friend of GILLIAN K., a minor, KIMBERLY K., as parent and next friend of MATTHEW K., a minor and CAROL K., as parent and next friend of WILLIAM K., a minor,

BY:    /s/ Joyce O'Neill Austin
       JOYCE O'NEILL AUSTIN

PREPARED BY:
JOYCE O'NEILL AUSTIN #959
SHRIVER, O'NEILL, & THOMPSON
515 N. Court Street
Rockford, Illinois 61103
Tele.:  (815) 963-4896
Fax:    (815) 963-4904

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| CHARLOTTE K., as parent and next | ) | |
| friend of GILLIAN K., a minor, | ) | |
| KIMBERLY K., as parent and next | ) | |
| friend of MATTHEW K., a minor and | ) | |
| CAROL K., as parent and next friend of | ) | |
| WILLIAM K., a minor, | ) | |
| Plaintiffs, | ) | 08-C-50115 |
| | ) | |
| vs. | ) | |
| | ) | |
| ROCKFORD BOARD OF EDUCATION | ) | |
| DISTRICT #205, | ) | |
| | ) | |
| Defendant. | ) | |

TO:    <u>See Attached Service List</u>

<u>NOTICE OF FILING</u>

TO:    Lori Hoadley                    Thomas Lester
       Hinshaw & Culbertson LLP        Hinshaw & Culbertson LLP
       100 Park Avenue                 100 Park Avenue
       P.O. Box 1389                   P.O. Box 1389
       Rockford, IL 61105-1389         Rockford, IL 61105-1389

PLEASE TAKE NOTICE THAT on July 31, 2008, I filed with the Clerk of the United States District Court for the Northern District of Illinois, Western Division, the attached *Memorandum in Support of Plaintiffs' Response Brief to the Issue of Exhaustion of Administrative Remedies* , a copy of which is herewith served upon you.

Dated:    <u>   July 31, 2008   </u>                 Respectfully submitted,

                                        BY: SHRIVER, O'NEILL & THOMPSON


                                         <u>/s/ Joyce O'Neill Austin            </u>
                                            Attorneys for Plaintiffs

THE LAW OFFICES OF
SHRIVER, O'NEILL & THOMPSON
Joyce O'Neill Austin, #959
515 N. Court Street
Rockford, IL 61103
Phone:  (815) 963-4896
Fax:    (815) 963-4904

<u>**AFFIDAVIT OF SERVICE**</u>

      The undersigned, pursuant to the provisions of Section 1-109 of the Illinois Code of Civil Procedure, hereby under penalty of perjury under the laws of the United States of America, certifies that on July 31, 2008, a copy of the following NOTICE OF FILING was electronically served via the U.S. District Court CM/ECF E-Filing System upon the following:

<u>**CHARLOTTE K., et al.  v. Rockford Board of Education, District No. 205**</u>

<u>For Defendant:</u>

Lori L. Hoadley

Hinshaw & Culbertson LLP

100 Park Avenue

P.O. Box 1389

Rockford, IL 61105-1389

Phone: (815) 490-4900


Thomas Lester

Hinshaw & Culbertson LLP

100 Park Avenue

P.O. Box 1389

Rockford, IL 61105-1389

Phone: (815) 490-4900


      /s/ Michelle Kayser


Prepared by:
THE LAW OFFICES OF
SHRIVER, O'NEILL & THOMPSON
Joyce O'Neill Austin
515 N. Court Street
Rockford, IL 61103
Phone: (815) 963-4896
Fax:    (815) 963-4904

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 13, 2003

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

No. 02-30845

DOUG WHITE, on behalf of Dylan Joseph White; GAIL WHITE,

Plaintiffs-Appellees,

versus

ASCENSION PARISH SCHOOL BOARD; ROBERT CLOUATRE; SUSAN VAUGHN,

Defendants-Appellants.

Appeal from the United States District Court
for the Middle District of Louisiana

Before JOLLY, WIENER, and BARKSDALE, Circuit Judges.

RHESA H. BARKSDALE, Circuit Judge:

For this interlocutory appeal from injunctive and other relief awarded parents of a child, pursuant to the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. § 1400 *et seq.*, primarily at issue is whether, consistent with the IDEA, a school system has the right to select a centralized location for providing services to a hearing-impaired child, notwithstanding the child's parents' request that services be provided instead at his neighborhood school (site-selection issue). The summary judgment and concomitant order granting the injunction and other relief are **VACATED**; judgment is **RENDERED** for Defendants on the site-selection issue; and this matter is **REMANDED**.

I.

Dylan White (Dylan), a hearing-impaired student, identified and qualified under the IDEA as disabled, attends school in Ascension Parish, Louisiana. Under the IDEA, he is qualified for special education and related services by Ascension Parish Schools (Ascension). Dylan uses a cochlear implant in one ear and a hearing aid in the other to receive sound input. He does not require communication assistance outside of the classroom environment, but uses a person — a cued speech transliterator — to assist him in processing spoken information in class. (A cued speech transliterator does not translate from spoken language to a sign language, but supplements lip-reading and residual or assisted hearing by hand and finger motions to distinguish between elements of speech that would otherwise appear identical.)

Ascension provides a system through which certain services are provided at centralized school sites. For hearing-impaired students who need cued speech transliterators, Ascension provides those services at three centralized schools (a primary school, a middle school, and a high school). These centralized schools are regular education campuses, and hearing-impaired students are "mainstreamed" (educated in regular classrooms). (Deaf students who use American Sign Language attend neighborhood, rather than centralized, schools.)

Dylan attends one of the centralized schools, Gonzales Primary, and has done so since he began attending Ascension schools. It is undisputed that Dylan has achieved substantial academic benefit and success at the centralized school.

In May 2000, when Dylan was in the second grade, the annual, IDEA-required conference for his individualized education program (IEP) was held. Dylan's parents requested his transfer from the centralized school to his neighborhood school, Dutchtown Primary, along with his transliterator (provided by Ascension). Gonzales Primary, the centralized school, is approximately five miles further from Dylan's home than the neighborhood school. Dylan's parents felt that transferring him to his neighborhood school would enhance his social development, including allowing him to attend school with neighborhood children.

Lengthy discussions were held at the IEP conference between the Whites and other IEP committee members regarding the school site selection. Ascension refused the transfer request pursuant to its policy of centralizing the cued speech program and because it believed Dylan was being provided an appropriate education at the centralized school.

The Whites requested an administrative due process hearing. After an evidentiary hearing, including live testimony, the hearing officer addressed whether Ascension "can determine placement for a hearing impaired child excluding parental input" and ruled in favor

3

of Ascension.  The Whites appealed the decision to a three-judge administrative panel, which affirmed.

The Whites then filed this action, seeking review of the administrative decision, as well as asserting violations of the IDEA, 20 U.S.C. § 1400 *et seq.*; the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 *et seq.*; the Rehabilitation Act (Section 504), 29 U.S.C. § 794; 42 U.S.C. § 1983; and various state laws.

The parties stipulated that the dispute was essentially a legal issue and filed cross motions for summary judgment.  Under the stipulation, the *only issue* was whether the School Board has the right to select the school that a student shall attend.

In March 2002, after oral argument, the district court granted summary judgment in favor of the Whites; it subsequently entered a declaratory judgment and injunction ordering, *inter alia*, that Dylan be assigned to his neighborhood school, along with his transliterator.  Other claims remain pending in district court.

II.

For this 28 U.S.C. § 1292(a)(1) interlocutory appeal from the injunctive relief, Ascension insists it fully complied with the IDEA.  The Whites respond that the Act was violated because:  they were not allowed input into the site determination; and, in any event, the IDEA contemplates neighborhood school site selection.  They also maintain that Dylan's placement at the centralized school violates state law.

As noted, the injunction was rendered pursuant to a summary judgment. Such judgments are reviewed *de novo*. *E.g.*, ***Amburgey v. Corhart Refractories Corp., Inc.***, 936 F.2d 805, 809 (5th Cir. 1991). A summary judgment is proper when, viewing the evidence in the light most favorable to the non-movant, "'there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law'". *Id.* (quoting FED. R. CIV. P. 56(c)).

Our role under the IDEA is purposefully limited.

> Congress left the choice of educational policies and methods where it properly belongs — in the hands of state and local school officials. Our task is not to second guess state and local policy decisions; rather it is the narrow one of determining whether state and local school officials have complied with the Act.

***Flour Bluff Indep. Sch. Dist. v. Katherine M.***, 91 F.3d 689, 693 (5th Cir. 1996) (quotation omitted), *cert. denied,* 117 U.S. 948 (1997). Moreover, the IDEA creates a presumption in favor of a school system's educational plan, placing the burden of proof on the party challenging it. *E.g.,* ***Teague Indep. Sch. Dist. v. Todd L.***, 999 F.2d 127, 132 (5th Cir. 1993).

The Whites frame the issue as whether, under the IDEA and state law, the school board may, *at its sole discretion,* reject placement in the school the child would attend if not disabled and the school closest to the student's home (the neighborhood school)

5

*without parental involvement* in that decision and where the IEP can be feasibly and appropriately implemented there. However, the school district did not stipulate (at least in district court) that *no* parental input was allowed on the issue of school selection. (In the administrative hearing, however, the issue was framed as: "Whether [Ascension] can determine placement for a hearing impaired child *excluding parental input*". (Emphasis added.)) Nor does such a stipulation fit the evidence: Dylan's mother testified before the hearing officer that, "[d]uring the IEP meeting[,] we discussed at length [Dylan's] going to Dutch Town [the neighborhood school] and why this had to continue for him to be at Gonzales Primary [the centralized school]".

The Whites, in essence, ask us to do one of two things: (1) render an advisory opinion based on a situation that is not before us (parents not given opportunity to offer any input concerning school selection); or (2) as the district court apparently did, equate giving input with dictating the outcome. Of course, we cannot render advisory opinions. Moreover, as discussed *infra*, we reject the assertion that parents are denied input into a decision if their position is not adopted.

Although Ascension and the Whites dispute whether there was "input", there is no genuine issue of material fact. Indeed, the parties do not dispute any facts, but instead dispute what constitutes the requisite parental input under the IDEA. Thus,

based upon the input described by Mrs. White (discussions at the IEP meeting), we will address the question that is before us in this case: whether the school district violated the IDEA in assigning Dylan to a centralized school, notwithstanding his parents' request that he be assigned to his neighborhood school.

A.

Ascension first asserts that the IDEA was not violated. The IDEA governs the rights and responsibilities of students who are qualified as disabled under the provisions of the Act. It requires that States provide disabled children with a "free appropriate public education" (FAPE). *See* 20 U.S.C. § 1412(a)(1). The cornerstone of the IDEA is the IEP, which is produced by a team that includes: the child's parents or guardian; a qualified representative of the local education agency who is knowledgeable about, *inter alia*, the resources of the school district; a regular education teacher of the child; a special education teacher of the child; other individuals at the discretion of the agency or the parent; and, where appropriate, the child. 20 U.S.C. § 1414(d)(1)(B). The written IEP specifies the program of benefits to which the student is entitled in order to receive a FAPE. Once a child's educational program is determined, the school must attempt to place the child in the "least restrictive environment" (LRE) (*e.g.,* as best it can, it must educate the child among not

7

disabled children). 20 U.S.C. § 1412(a)(5); 34 C.F.R. § 300.500-300.556.

When an action is brought under the IDEA, or the appropriateness of an IEP challenged, our inquiry is two-fold: (1) whether "the [IEP] developed through the Act's procedures [is] reasonably calculated to enable the child to receive educational benefits"; and (2) whether the school district has "complied with the procedures set forth in the [IDEA]". *Board of Educ. v. Rowley*, 458 U.S. 176, 206-07 (1982). "If these requirements are met, the State has complied with the obligations imposed by Congress and the courts can require no more." *Id.* at 207.

1.

Of course, a primary purpose of the IDEA is to ensure that disabled children receive a FAPE. *See* 20 U.S.C. § 1412(a). A school satisfies that requirement

> by providing personalized instruction with sufficient support services to permit the child to benefit educationally from that instruction. Such instruction and services must be provided at public expense, must meet the State's educational standards, must approximate the grade levels used in the State's regular education, and must comport with the child's IEP. In addition, the IEP, and therefore the personalized instruction, should be formulated in accordance with the requirements of the Act and ... should be reasonably calculated to enable the child to achieve passing marks and advance from grade to grade.

*Rowley*, 458 U.S. at 203-04. A FAPE need not maximize the child's potential; it must guarantee "a basic floor of opportunity".

8

*Cypress-Fairbanks Indep. Sch. Dist. v. Michael F.*, 118 F.3d 245, 248 (5th Cir. 1997) (quotation omitted).

Under this prong of *Rowley,* the focus of our inquiry is on academic achievement; and, while the IDEA requires the school to provide services to allow the child the requisite basic floor of opportunity, it does not require the school to make special accommodations at the parent's request (no matter how well intentioned), particularly where the request is not related to helping the child achieve *academic* potential. As noted, it is undisputed that Dylan was succeeding academically at the centralized school; thus, his IEP clearly met the requirements of FAPE. It is also undisputed that the parents' request that Dylan attend his neighborhood school was primarily social — they wanted him to be able to attend school with other neighborhood children; this concern is beyond the scope of the "educational benefit" inquiry courts make under the IDEA.

2.

Regarding whether the IDEA's procedural requirements were followed, as stated, the Whites first assert that they were improperly denied input into the site selection. They also maintain the decision otherwise contravened the IDEA.

a.

As noted, the IDEA requires that the parents be part of the team that creates the IEP and determines the educational placement

9

of the child, 20 U.S.C. § 1414(d)(1)(B); and the IEP is to include location, 20 U.S.C. § 1414(d)(1)(A)(vi) (IEP must include the projected date for the beginning of services and their anticipated frequency, location, and duration). Additionally, 20 U.S.C. § 1414(f) requires the local education agency to ensure that the parents are members of any group that makes decisions on educational placement.

These statutory provisions do not, however, explicitly require parental participation in site selection. "Educational placement", as used in the IDEA, means educational program — not the particular institution where that program is implemented. *E.g.*, **Sherri A.D. v. Kirby**, 975 F.2d 193 (5th Cir. 1992) ("educational placement" not a place, but a program of services); **Weil v. Board of Elem. & Secondary Educ.**, 931 F.2d 1069 (5th Cir. 1991) (transfer of child to another school was not a change in "educational placement"). Thus, contrary to the Whites' position, that parents must be involved in determining "educational placement" does not necessarily mean they must be involved in site selection. Moreover, that the parents are part of the IEP team and that the IEP must include location is not dispositive. The provision that requires the IEP to specify the location is primarily administrative; it requires the IEP to include such technical details as the projected date for the beginning of services, their

10

anticipated frequency, and their duration.  *See* 20 U.S.C. §
1414(d)(1)(A)(vi).

The Whites also rely on the IDEA's implementing regulations.
34 C.F.R. § 300.552 provides:

> In determining the educational placement of a
> child with a disability ... each public agency
> shall ensure that —
>
> (a)  The placement decision —
>
> (1)  Is made by a group of persons, including
> the parents, and other persons knowledgeable
> about the child, the meaning of the evaluation
> data, and the placement options; and
>
> (2)  Is made in conformity with the LRE
> provisions...
>
> (b)  The child's placement —
>
> (1)  Is determined at least annually;
>
> (2)  Is based on the child's IEP; and
>
> (3)  Is as close as possible to the child's
> home;
>
> (c)  Unless the IEP of a child with a
> disability requires some other arrangement,
> the child is educated in the school that he or
> she would attend if nondisabled....

The Whites note that "placement" in 34 C.F.R. § 300.552 appears to

have a broader meaning than just educational program (thus, the

requirement that "placement" be based on the IEP, which contains

the educational program, along with other requirements) and to

relate in some way to location (thus, the reference to distance

from the child's home).  Ascension responds that "placement" does

not mean a particular school, but means a setting (such as regular classes, special education classes, special schools, home instruction, or hospital or institution-based instruction). It cites 34 C.F.R. § 300.551, which describes "placement" options as such. This is the better view.

In any event, even assuming *arguendo* that the regulations contemplate a parental right to provide input into the location of services, the facts are undisputed that the Whites did so as part of the IEP team that discussed location at length and that ultimately selected the centralized site. To accept the Whites' view of "input" would grant parents a veto power over IEP teams' site selection decisions. Congress could have included that power in the IDEA; it did *not* do so. The right to provide meaningful input is simply not the right to dictate an outcome and obviously cannot be measured by such. *See, e.g., Blackmon v. Springfield R-XII Sch. Dist.*, 198 F.3d 648, 656 (8th Cir. 1999) (where no "serious hamper[ing]" of parent's opportunity to participate in the formulation process, IDEA requirement of meaningful parental input satisfied notwithstanding that parent's desired program not selected); *Lachman v. Illinois St. Bd. of Educ.*, 852 F.2d 290, 297 (7th Cir.) ("[P]arents, no matter how well-motivated, do not have a right under [the IDEA] to compel a school district to provide a specific program or employ a specific methodology in providing for the education of their handicapped child".), *cert. denied*, 488 U.S.

925 (1988).   Absent any evidence of bad faith exclusion of the parents or refusal to listen to or consider the Whites' input, Ascension met IDEA requirements with respect to parental input.   In short, on this record, Ascension complied with this procedural component.

b.

The question then becomes whether Ascension was otherwise required by the IDEA to defer to the Whites' wishes that their son be transferred, along with his support services, to the neighborhood school. The Whites point to two main provisions that they contend support neighborhood school selection:   (1) the child's placement is determined at least annually, is based on the child's IEP, and *is as close as possible to the child's home*, 34 C.F.R. § 300.552(b) (emphasis added); and (2) unless the IEP requires some other arrangement, the child is educated in the school that he or she would attend if not disabled, 34 C.F.R. § 300.552(c).

Regarding these provisions, their qualifying language is critical. 34 C.F.R. § 300.552(b) only requires that the student be educated as close *as possible* to the child's home. 34 C.F.R. § 300.552(c) specifies that the child is educated in the school he would attend if not disabled *unless the IEP requires some other arrangement*. Here, it was not possible for Dylan to be placed in his neighborhood school because the services he required are

13

provided only at the centralized location, and his IEP thus
requires another arrangement.

Of course, as the Whites point out, neighborhood placement is
not possible and the IEP requires another arrangement only because
Ascension has elected to provide services at a centralized
location.   This is a permissible policy choice under the IDEA.
Schools have significant authority to determine the school site for
providing IDEA services.

> State agencies are afforded much discretion in
> determining which school a student is to
> attend ... The regulations, not the statute,
> provide only that the child be educated "as
> close as possible to the child's home."
> However, this is merely *one of many factors*
> for the district to take into account in
> determining the student's proper placement.
> *It must be emphasized that the proximity*
> *preference or factor is not a presumption that*
> *a disabled student attend his or her*
> *neighborhood school.*

**Flour Bluff**, 91 F.3d at 693-94 (emphasis added).  In **Flour Bluff**,
a deaf child's parents objected to her attending a centralized
program rather than her neighborhood school.  Our court held in
favor of the school:

> IDEA expressly authorizes school districts to
> utilize regional day schools such as the one
> at issue here, and we think the importance of
> these regional programs is obvious.
> Undoubtedly there are a limited number of
> interpreters, speech pathologists with
> backgrounds in deaf education, and deaf
> education teachers; and by allocating these
> limited resources to regional programs, the
> state is better able to provide for its
> disabled children.  Additionally, by placing

> these educators at regional centers, those
> centers are better able to provide further
> training for those educators and make
> substitutions for absent educators.

*Id.* at 694 (citations omitted).

All of our sister circuits that have addressed the issue agree that, for provision of services to an IDEA student, a school system may designate a school other than a neighborhood school. Restated, no federal appellate court has recognized a right to a neighborhood school assignment under the IDEA. *See, e.g., McLaughlin v. Holt Public Sch. Bd. of Educ.*, 320 F.3d 663, 672 (6th Cir. 2003) (LRE provisions and regulations do not mandate placement in neighborhood school); *Kevin G. by Robert G. v. Cranston Sch. Comm.*, 130 F.3d 481, 482 (1st Cir. 1997) ("[W]hile it may be preferable for Kevin G. to attend a school located minutes from his home, placement [where full-time nurse located] satisfies [the IDEA].... The school district has an obligation to provide a school placement which includes a nurse on duty full time, but it is not required to change the district's placement of nurses when, as in this case, care is readily available at another easily accessible school".); *Hudson v. Bloomfield Hills Public Sch.*, 108 F.3d 112 (6th Cir. 1997) (IDEA does not require placement in neighborhood school); *Urban v. Jefferson County Sch. Dist. R-1*, 89 F.3d 720, 727 (10th Cir. 1996) (IDEA does not give student a right to placement at a neighborhood school); *Murray v. Montrose County Sch. Dist.*, 51 F.3d

921, 928-29 (10th Cir.) (no presumption in IDEA that child must attend neighborhood school — proximity to home only one factor), *cert. denied*, 516 U.S. 909 (1995); ***Schuldt ex. rel. Schuldt v. Mankato Indep. Sch. Dist. No. 77,*** 937 F.2d 1357, 1361-63 (8th Cir. 1991) (school may place student in non-neighborhood school rather than require physical modification of the neighborhood school to accommodate the child's disability); ***Barnett v. Fairfax County Sch. Bd.,*** 927 F.2d 146 (4th Cir.) (school district complied with IDEA by providing deaf student with "cued speech" program in a centralized school approximately five miles farther than neighborhood school), *cert. denied*, 502 U.S. 859 (1991); ***Wilson v. Marana Unified Sch. Dist. of Pima County,*** 735 F.2d 1178 (9th Cir. 1984) (school district may assign child to school 30 minutes away because teacher certified in child's disability was assigned there, rather than move the service to the neighborhood school).

Administrative agency interpretations of the regulations confirm that the school has significant authority to select the school site, as long as it is educationally appropriate. The Office of Special Education Programs (OSEP), the Department of Education branch charged with monitoring and enforcing the IDEA and its implementing regulations, has explained:

> [I]f a public agency ... has two or more equally appropriate locations that meet the child's special education and related services needs, the assignment of a particular school ... may be an administrative determination,

16

>       provided that the determination is consistent
>       with the placement team's decision.

*Letter from Office of Special Education Programs to Paul Veazey* (26

Nov. 2001). *See also, e.g., Letter to Anonymous*, 21 IDELR 674

(OSEP 1994) (it is permissible for a student with a disability to

be transferred to a school other than the school closest to home if

the transfer school continues to be appropriate to meet the

individual needs of the student); *Letter to Fisher,* 21 IDELR 992

(OSEP 1994) (citing policy letter indicating that assignment of a

particular location is an administrative decision).

The Whites insist that 1997 amendments to the IDEA enlarged

parents' role. Nevertheless, the amendments do not state — and the

Whites do not cite any post-amendment authority for the proposition

— that parents may alter a school's good faith policy decision

regarding site selection. Moreover, the 2001 OSEP letter

(interpreting the current version of the IDEA) is contrary to the

Whites' position.

The Whites also urge that there is simply no reason the

transliterator cannot move to Dylan's neighborhood school, because

she provides services only for Dylan. Again, our task is not to

question educational policy decisions; rather, it is to determine

whether state and local officials have complied with the IDEA.

This principle is unquestionably applicable here:

>       Whether a particular service or method can
>       feasibly be provided in a specific special
>       education setting is an administrative

17

> determination that state and local school
> officials are far better qualified and
> situated than are we to make.

***Barnett***, 927 F.2d at 152.

Regardless, Ascension has proffered numerous, sound reasons for its centralization policy, including: (1) ability to cover absences and scheduling difficulties; (2) training and staff development; (3) effective use of limited resources; and (4) educational and social advantages. Concerning Dylan's placement, it notes: (1) while Dylan is the only student now served by the transliterator, another student needing to share the transliterator could move into the district; and (2) making an exception to the centralization policy for Dylan would not be fair to other students who share transliterators and must attend the centralized school.

B.

Ascension also disputes that Louisiana law requires the school to place Dylan in his neighborhood school. The Whites point to provisions similar to those contained in the IDEA and its regulations, especially: (1) LA. REV. STAT. § 17:1944(B)(14), add. 4, which requires "placement" of disabled children in the school nearest their place of residence, *if placement is appropriate*; (2) LA. REV. STAT. 17:1952(C), which requires that a recommendation by a parent as to educational placement be considered equally with any other factors; and (3) LRE provisions that dictate placement in the school the child would attend if not disabled unless the IEP

18

requires another arrangement and, if not in that school, as close as possible to the student's home, Louisiana Department of Education, Bulletin 1706A § 446(B)(3)(a).

Again, the Whites conflate site selection and educational placement.    Bulletin 1706A defines placement alternatives as regular classes, special classes, special schools, etc.    Bulletin 1706A § 446 (A)(4).    Moreover, the IEP Handbook in Louisiana clarifies that "the IEP committee must participate in decisions made about the placement; however, the school system has the right to select the actual school site in view of committee decisions". Louisiana Department of Education, Bulletin 1530 at 9.    *See also id.* at 32 (school system has responsibility of determining school site).    In addition, the IEP form reserves the right of the local education agency to fill in site determination, stating that this provision must be completed by the school representative and forwarded to the parents within ten days if not specified at the IEP meeting.    For this issue, Ascension has not violated state law.

III.

In sum, neither the IDEA nor state law prevents Ascension from selecting the centralized school site for the implementation of Dylan's IEP, notwithstanding parental input to the contrary.    For the foregoing reasons, the summary judgment in favor of the Whites and the concomitant order granting the injunction and other relief are **VACATED**; judgment is **RENDERED** for Defendants on the site-

selection issue; and this matter is **REMANDED** to the district court for further proceedings consistent with this opinion.

*VACATED; RENDERED;* **and REMANDED**

**Before The**
**State Of Wisconsin**
**DIVISION OF HEARINGS AND APPEALS**

| | |
|---|---|
| In the Matter of [Student]<br>v.<br>Hustisford School District | Case No.: LEA-01-042 |

### ORDER FOR DISMISSAL

The Parties to this proceeding are:

> [Student], by
> Attorney Susan M. Gramling
> Attorney at Law
> 2266 N. Prospect Ave., Suite 505
> Milwaukee, WI 53202

> Hustisford School District, by
> Attorney Greg Ladewski
> Davis & Kuelthau, S.C.
> 111 E. Kilbourn Ave. #1400
> Milwaukee, WI 532202-9369

### INTRODUCTION

On July 23, 2001, the Department of Public Instruction received a request for a due process hearing, under Subchapter V, Chapter 115, Wis. Stats., and the Individuals with Disabilities Education Act (IDEA) from [Father] and [Mother] (the "Parents") on behalf of their son, [Student] (the "Student"). This request was transmitted to the Division of Hearings and Appeals on that same day.

On August 15, 2001, the Hustisford School District ("District") filed a motion for summary judgment. The Parents filed their response on August 24, 2001.

On August 31, 2001 a telephone status conference was convened to address the motion for summary judgment. The matter is hereby dismissed, not upon the grounds asserted by the School District, but because the matter is not ripe for adjudication at this time.

### FINDINGS OF FACT

1. The Student is a five-year-old deaf/hard of hearing child.

2. During the 2000/2001 school year, the Student participated in the CESA-6 Elementary Deaf/Hard of Hearing (D/HH) Program at John Hustis Elementary School.

3. On or about June 29, 2001, the District notified the Parents that the CESA-6 Elementary D/HH program would be moving to Lomira and that the Student would be attending classes in Lomira

4. The Parent's requested a due process hearing asserting that this change could not be made without an IEP meeting.

5. On August 31, 2001, a telephone status conference was convened to entertain the School District's motion for summary judgment.

6. As of August 31, 2001, the School District and the Parents had set a date for an IEP meeting to address the Parents' concerns about staff qualifications and the Student's nut and bee allergies.

## CONCLUSIONS OF LAW

In order to show that the movement of the Student with the CESA-6 Elementary D/HH program was a change in "placement" requiring approval of the IEP team, and therefore, an IEP meeting, the parents must show that, "the student's education program was materially altered, and not an instance which involves only a change in the physical location of the placement." *In Re: Student with a Disability*, 29 IDELR 926 (1998), citing *Letter to Fisher*, 21 IDELR 992 (1994). Factors to be considered are, "whether the education program set out in the child's IEP has been revised; whether the child will be able to be educated with non-disabled children to the same extent; whether the child will have the same opportunities to participate in nonacademic and extracurricular services; and whether the new placement option is the same option on the continuum of alternative placements." *Id*.

At the August 31, 2001 telephone conference, the Parents did not know and could not state how the Student's educational program would be substantially changed, primarily because the matter had not yet been discussed with the School District. Because the Parents do not yet know how the Student's educational program will be changed, if at all, by the move to Lomira, the parents cannot and do not know whether they were unfairly denied an IEP meeting. The School District has since agreed to convene an informational IEP meeting. Therefore, there is no dispute for the Division of Hearings and Appeals to adjudicate at this time.

## ORDER

THEREFORE,

1. The Parent's request for a due process hearing is hereby DISMISSED, without prejudice.
2. Since a hearing on the merits was never conducted, I am unable to declare a prevailing party in this case.

Dated at Madison, Wisconsin on September 4, 2001.

STATE OF WISCONSIN
DIVISION OF HEARINGS AND APPEALS
5005 University Avenue, Suite 201
Madison, Wisconsin 53705-5400
Telephone: (608) 266-7709
FAX: (608) 264-9885
By:_____

Mayumi M. Ishii
Administrative Law Judge

XXXX XXXX           *   BEFORE ALAN B. JACOBSON,

     v.                   *   AN ADMINISTRATIVE LAW JUDGE

                         *   OF THE MARYLAND OFFICE

MONTGOMERY COUNTY

                         *   OF ADMINISTRATIVE HEARINGS

PUBLIC SCHOOLS

                         *   OAH NO.: MSDE-MONT-OT-04-42896

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

## DECISION

STATEMENT OF THE CASE
ISSUES
SUMMARY OF THE EVIDENCE
FINDINGS OF FACT
DISCUSSION
CONCLUSIONS OF LAW
ORDER

## STATEMENT OF THE CASE

This case arises from a request by XXXX XXXX ("Parent"), on behalf of XXXX XXXX ("Child") for a hearing to review the identification, evaluation or placement of the child. The request was filed with Montgomery County Public Schools ("MCPS") on August 17, 2004.

The hearing was held on September 13, 2004 before Alan B. Jacobson, Administrative Law Judge ("ALJ") at MCPS, 850 Hungerford Drive, Rockville, Maryland. At the hearing, Alison B. Steinfels, Esq., MCPS, 850 Hungerford Drive, Rockville, Maryland 20876, represented the MCPS. The Parent represented herself.

The hearing was held pursuant to the following laws: Individuals With Disabilities Education Act ("IDEA") Reauthorization, Disabilities Education Act Amendments of 1997, 20 U.S.C.A. § 1415 (2000); 34 C.F.R. § 300.507 (2001); Md. Code Ann., Educ. § 8-413 (2004);

Code of Maryland Regulations ("COMAR") 13A.05.01; and Maryland State Department of

Education Guidelines for Maryland Special Education Mediation/Due Process Hearings.

Procedure in this case is governed by the contested case provisions of the Administrative

Procedure Act, and the Rules of Procedure of the Office of Administrative Hearings. Md. Code

Ann., State Gov't §§ 10-201 through 10-226 (1999 & Supp. 2004); and COMAR 28.02.01.

## ISSUE

The issues on appeal are (1) must MCPS implement the Child's IEP for the 2004-05

school year in a public school setting, and if not, (2) has MCPS taken appropriate steps to

implement the IEP in a non-public school setting.

## SUMMARY OF THE EVIDENCE

A.    Exhibits

The Parents did not offer any exhibits into evidence.

The following exhibits were admitted into evidence on behalf of the MCPS:

MCPS #1 – Observation of the Child in the classroom, dated February 27, 2003

MCPS #2 – Observation of the Child in the classroom, dated November 20, 2003

MCPS #3 – Guidelines for Behavioral Strategies, dated November 25, 2003

MCPS #4 – Observation of the Child in the classroom, dated March 30, 2004

MCPS #5 – Special Education Assessment, [School 1] ([School 1]), dated April 16, 2004

MCPS #6 – IEP Team Meeting and decisions for school year 2004-05, meeting date
          May 3, 2004

MCPS #7 – [School 1] Behavior Protocol, date 12/03, Revision Date 4/04

MCPS #8 – Graph Analysis, dated March 2004

MCPS #9 – [School 1] Transdisciplinary Summary of ESY Progress, dated July 27, 2004

2

MCPS #10 – Letter from [School 2] to MCPS, dated May 13, 2004

MCPS #11 – Referral from MCPS to [School 2], dated July 6, 2004

MCPS #12 – Letter from [School 3] to MCPS, dated May 14, 2004

MCPS #13 – Letter from [School 4] to MCPS, dated June 14, 2004

MCPS #14 – Letter from [School 5] to MCPS, dated August 13, 2004

MCPS #15 – Brochure describing [School 5]

MCPS #16 – Psychological Evaluation Report, dated September 9, 2003

B.  Testimony

The following witnesses presented testimony on behalf of the Parents:

XXXX XXXX, the Child's mother

XXXX XXXX, the Child's aunt

The following witnesses presented testimony on behalf of the MCPS:

XXXX XXXX, Principal, [School 1], accepted as an expert in Special Education

XXXX XXXX, Placement Specialist, MCPS, accepted as an expert in Special Education and Special Education Placement

XXXX XXXX, School Psychologist, MCPS, accepted as an expert in School Psychology

**FINDINGS OF FACT**

Based upon the evidence presented, I find the following facts by a preponderance of the

evidence:

1.  The Child is currently six years old; his date of birth is XXXX, 1998.

3

2. The Child early manifested developmental delays and was enrolled at [School 1], a non-public provider of special education services for prekindergarten in the XXXX Program in 2000.

3. Standardized psychological testing attempted in February, March, June, July, and August of 2003 could not be completed for the Child due to his inattention, modifying the standardized administration procedures, and due to not obtaining a base score.

4. As of September 2003, the Child demonstrated significantly subaverage intellectual functioning.

5. As of December 2003, in class the Child was engaging in dangerous or disruptive behaviors an average of 62 times per school day, defined as attempting to hit, kick, bite, pinch, scratch, and attempting to throw or destroy materials, furniture, etc.

6. The IEP for 2004-05 was prepared at the MCPS team meeting on May 3, 2004.

7. With regard to the Child's ability to participate with nondisabled peers, as of the date of the latest IEP, he was not able to participate with nondisabled peers due to his extreme hyperactive behaviors, requiring extensive support.

8. The IEP calls for special education services for all academic areas, for a total of 28 hours per week.

9. The IEP also calls for related services of speech and language one hour and occupational therapy one hour per week.

10. As of May 3, 2004, the Child's previous history and documented need for a more supportive environment, indicate that a less than full-time special education placement would not meet his educational needs.

4

11. The Child has been prescribed medication to relieve hyperactivity, but the Parents have administered it only sporadically.

12. For the 2004-05 School Year the Child is assigned to an "interim placement" at [School 6], pending placement at a non-public Special Education Day School.

13. The Child is currently not attending school.

## DISCUSSION

The Individuals with Disabilities Education Act ("IDEA"), requires, "that all children with disabilities have available to them . . . a free appropriate education that emphasizes special education and related services designed to meet their unique needs . . ." 20 U.S.C.A. § 1400(d) (1999). The Act provides federal money to the states to educate disabled children on condition that states comply with the extensive goals and procedures of the Act. 20 U.S.C.A. §§ 1412-1414, 34 C.F.R. § 300.2, *Board of Educ., Hendrick Hudson Central School Dist. v. Rowley*, 458 U.S. 176 (1982). Maryland's special education law is found at Md. Code Ann., Educ. § 8-101 and following, and the regulations governing the provision of special education to children with disabilities are found at COMAR 13A.05.01.

A free appropriate education ("FAPE") is defined in COMAR 13A.05.01.03 as follows:

"Free, appropriate public education" means special education and related services which:
(a) Are provided at public expense, under public supervision and direction;
(b) Meet the standards of the Department, including 34 CFR 300 and 301, and this chapter;
(c) Include preschool, elementary school, or secondary education; and
(d) Are provided in conformity with an IEP that meets the requirements of 20 U.S.C. § 1414, and this chapter.

FAPE is, in part, furnished through the development and implementation of an individualized education program ("IEP"), for each disabled child. *Rowley*, 458 U.S. at 181-182.

COMAR 13A.05.01.09 defines an IEP and outlines the required content of an IEP as a written description of the special education needs of the student and the special education and related services to be provided to meet those needs. The goals, objectives, activities, and materials shall be adapted to the needs, interests, and abilities of each student. 20 U.S.C.A. § 1414(d). It must be reasonably calculated to enable the child to receive educational benefits. *Rowley*, at 182.

While FAPE does not require "the best possible education that a school system could provide if given access to unlimited funds," *Barnett v. Fairfax Co. School Bd.*, 927 F.2d 146 (4th Cir. 1991), it does require the State to provide personalized instruction with sufficient support services to permit the handicapped child to benefit educationally. The IDEA only requires that the child be able to benefit from instruction that he receives, not that he is able to maximize his potential or that he receives optimal services. *Rowley*, 458 U.S. at 200, 102 S.Ct. at 3048; *Burke County Bd. of Educ. v. Denton*, 895 F.2d 973, 980 (4th Cir. 1990); and *Conklin v. Bd. of Educ.*, 946 F.2d. 306 (4th Cir. 1991).

In turn, "educational benefit" has been construed to mean more than trivial or *de minimus* educational progress. *In Re Conklin*, 946 F.2d 306 (4th Cir. 1991). See also, *Polk v. Central Susquehanna Intermediate Unit 16*, 853 F.2d 171 (3rd Cir. 1988). The IDEA requires an IEP to provide a "basic floor of opportunity that access to special education and related services provides." *Tice v. Botetourt County Sch. Bd.*, 908 F.2d 1200, 1207 (4th Cir. 1990). Nor is there a "requirement to guarantee any particular outcome for the child." *King v. Bd. of Educ. of Allegany County*, 999 F. Supp. 750, 767 (4th Cir. 1998).

In *Rowley*, the Court set forth a two-part analysis to determine whether a child is being accorded a free appropriate public education under the IDEA. First, a determination must be made whether there has been compliance with the procedures set forth in the IDEA, and second, whether the IEP as

6

developed through the required procedures is reasonably calculated to enable the child to receive educational benefits. Once an IEP is shown to be procedurally proper, the judgment of education professionals regarding the child's placement should be questioned only with great reluctance by the reviewing authority. *Tice,* 908 F.2d 1200, 1207. Courts have held that "[l]ocal educators deserve latitude in determining the individualized education program most appropriate for a disabled child. The IDEA does not deprive these educators of the right to apply their professional judgment." *Hartman v. Loudoun County Bd. of Educ.,* 118 F.3rd 996, 1001 (4th Cir. 1997).

It is a further basic principle that, to the maximum extent possible, the IDEA seeks to mainstream the child into regular public schools, but in any case, to place the child in the "least restrictive environment" consistent with his or her educational needs. 20 U.S.C.A. § 1412(5). What constitutes the least restrictive environment differs for each child, but could range from a regular public school to a residential school where 24-hour supervision is provided. COMAR 13A.05.01.10A. Where an IEP calls for residential placement of a child for educational reasons, the school system is financially responsible for the cost of the school. Where an IEP calls for residential placement for non-educational reasons, it is not financially responsible. Residential care is only required if the "educational benefits which can be provided through residential care are essential for the child to make *any* educational progress at all…" *Burke Co. Bd. of Ed. v. Denton,* 895 F.2d 973, 980 (4th Cir. 1990).

Thus the Federal regulation on special education placement provides:

In determining the educational placement of a child with a disability, …each public agency shall ensure that-
(a) The placement decision-
(1) Is made by a group of persons knowledgeable about the child, the meaning of the evaluation data, and the placement options; and
(2) Is made in conformity with the LRE provisions of this subpart, including §§ 300.550-300.554; [and]
(b) The child's placement-
. . .

7

(2) Is based on the child's IEP; and

(3) Is as close as possible to the child's home;

34 C.F.R.300.552.

In the present case, on August 17, 2004, the Parent filed a request for a due process hearing

with the following statement, in pertinent part:

I am not in agreement with the placement for my son . . . [at] [School 5] [sic] for the
2004-2005 school year. I feel that the emphasis should be education and moving
towards the goal of integration into [the] normal classroom and not further
elimination from his peers. [Child] does his best when he is in an environment that
is academically oriented. I would not want him to be further left behind. [Child] is
enthusiastic and interested in learning. I am willing to continue to explore the use of
medication to help him. He is currently on medication holiday [sic] but will be back
on medication before the beginning of school.

This statement by the Parent in essence was repeated by her in testimony at the hearing.

The Child was referred by MCPS to four possible nonpublic schools for implementation of

the IEP developed by the multidisciplinary team on May 3, 2004, and agreed to by the Parent.

Those schools were [School 2], [School 3], [School 4], and [School 5] -- which operates three

schools, one of which is in [City] Maryland, within roughly a half hour bus ride from the Child's

residence. However, three of those schools rejected the referral.

Two of the schools, [School 2] and [School 3], determined that the Child's disabilities were

in some respect too severe to be included with their students. MCPS Exs. #10 and #12. [School 3]

responded that the Child "would be better served in a full time therapeutic program that could

address his behavioral issues." MCPS Ex. #12. [School 2] rejected the referral "based on his

diagnosis and the level of functioning." MCPS Ex. #10. [School 2] also contrasted its student

body's performance compared with the Child's as "capacity to function cognitively near or above

age level," which the Child, at least in [School 2]'s estimation, did not meet. *Id.*

A different response was sent to MCPS by [School 4]. According to [School 4]'s letter, the

8

Parent mother visited the school on May 20, 2004, without revealing the referral from MCPS. MCPS Ex. #13. On May 27, 2004, according to the writer for [School 4], the Parent informed the school by telephone that she did not like the school and that it would be "inappropriate" for him. Further, according to the letter, she criticized the accuracy of the IEP because her son is hard to test. She also reportedly said that the Child had improved and was no longer on medications. *Id.*

With three of the four referrals rejected by the addressee schools (including [School 4], which was evidently pushed in that direction by the Parent), the remaining school, [School 5], accepted the Child, subject to completion of the contract with MCPS. However, both in her hearing request and in her testimony, the Parent concentrated her most negative response on [School 5]. According to the Parent, her nephew attended [School 5] in [City] recently and had a very bad experience in which, according to the Parent, the nephew learned nothing and was caught in a class of children with more severe problems than his own. Further, the nephew left [School 5] and is now attending a middle school with "inclusion" in which he supposedly is doing very well.

None of these assertions were supported by documentary evidence or testimony from educators or experts. Instead, the Parent offered the testimony of her sister, mother of the nephew who attended [School 5], who basically repeated these claims. There was no attempt made even to show that the nephew has roughly comparable disabilities to the Child in this case. The conclusion reached by the Parent was, like [School 4], she does not like [School 5] and has no intention of sending the Child there.

The Parent's case was followed by the testimony of the MCPS witnesses. The Principal of [School 1], XXXX XXXX, testified at length concerning the intensive attention given to strategies used by the school to control the dangerous and destructive behaviors of the Child. For three years of pre-school she and the four adults attending to the Child's class of nine children, structured the

9

school day into no more than two to fifteen minute intervals, during which attempts were made to gain the Child's attention and to help him learn, at first basic activities, such as using a door knob and hanging up his clothes. In most instances the longest his attention would hold was one to five minutes.

In more recent months, last school year and during the summer months, they introduced letter and number recognition to the Child, using pictures and word strips. Many times, however, the staff was required to stop all teaching attempts and spend time, up to a half-hour, simply redirecting the Child's behavior. The [School 1] Special Education Assessment, on April 16, 2004, noted that the Child requires constant prompting to attend, but he is unable to maintain his attention to task for more than one task. MCPS Ex. #5. When the Child's behaviors become aggressive and dangerous, the assessor noted that it can take one to three staff to secure the safety of staff and students, as well as help the Child regain appropriate behaviors. Id.

Overall, Ms. XXXX noted that the Child did show improvement over time in controlling his outbursts so that he could last as long as five minutes in a task. Nevertheless, the educators reported that without reinforcement even last school year he could not be expected to stay on task. Based on observations of special educators, his cognitive skills as late as April 2004 remained primarily at the 32-35 month level, with isolated readiness skills emerging at 4-5 years. MCPS Ex. #5.

The MCPS School Psychologist, Dr. XXXX testified that he observed the Child in class at [School 1]. It is Dr. XXXX's assessment that in addition to his hyperactivity, the Child is mildly to moderately autistic. He does not communicate with words and has sensory deficits. He is not ready to learn in groups. The Child is also of course still quite young. All of these factors imply the need for the Child to be in a very small, behaviorally engineered program that is not available in a public school environment. He is still learning critical life skills, and must receive constant positive

10

reinforcement. The Placement Specialist, Ms. XXXX, testified that all of the strategies outlined by Dr. XXXX and Ms. XXXX are available at [School 5], as well as other schools.

IDEA does not define "change in placement". The phrase was not defined in the precursor statute, Education of the Handicapped Act ("EHA"), nor was legislative history given to assist in interpretation. *Honig v. Doe*, 484 U.S. 305, 325 at note 8, 108 S.Ct. 592, 605, 98 L.Ed.2d 686 (1988).

The Office of Special Education Programs (OSEP), of the U.S. Department of Education, issued an opinion letter on the subject of determining when a "change in educational placement" had occurred, and stated that the determination would have to be made on a case by case basis. After examining various factors, "the public agency responsible for educating the child must determine whether the proposed change would substantially or materially alter the child's educational program." The letter concluded that a change in location alone would not substantially or materially alter the child's educational program (and therefore would not be a change in educational placement) (emphasis added). *Letter to Fisher*, 21 IDELR 992, 993 (OSEP 1994).

Cases from around the country have relied upon that opinion and reached the same conclusion, and are persuasive. In *Morris v. Metropolitan Government of Nashville and Davidson County*, 26 IDELR 159 (D. Tenn. 1997) the school district paid for placement of students in a private school. However, upon developing a program to provide the necessary services at a public school, the school district proposed transferring the students to the public facility. Their IEPs and the services provided would remain unchanged. The parent requested a due process hearing on the transfer. The District Court relied upon and cited *Urban v. Jefferson County Schl. Dist.* 89 F.3rd 720, 728, (10th Cir. 1996), accord, *Concerned Parents and Citizens*

11

*for the Continuing Education at Malcolm X v. New York City Bd. of Educ.*, 629 F.2d 751, 753 (2nd Cir. 1980), and *In re Child with Disabilities*, 21 IDELR 682, 684 (SEA Mich. 1994) ("clearly the choice of a placement, a building where a teacher is, is not a prerogative of the parent. Those responsibilities remain with the superintendent or his designee"), in deciding to grant the school district's motion for summary judgment. The decision was based upon the conclusion that under IDEA a change in the site of IDEA services was not a change in placement.

Similarly, in *Fort Bend Independent School District*, 27 IDELR 626 (1997), an intra-district student transfer was revoked, requiring the student to be removed from the school he had been in for the past few years. The student's IEP remained the same and there was no material alteration to his program. Therefore, the hearing officer held that "The revocation of an intra-district transfer for placement at a particular ...school did not constitute a change in placement...when no alteration to Jade's educational program was required and the change amounted only to a change in the physical location of the program." 27 IDELR at 627.

Thus the law is clear that a change in site location, without more, does not equal a change in educational placement. In the present matter, regardless of the school where the Child attends he must receive the services of his IEP, to which the Parent agreed and which required an entire school day without exposure to non-disabled peers. MCPS Ex. #6.

Finally, the 4th Circuit Court of Appeals has recently held that parents who challenge an IEP have the burden of proof in the administrative hearing. *Weast v. Schaffer*, 377 F.3d 449, 456 (4th Cir. July 29, 2004). The facts in the instant case show that MCPS kept up with the Child's assessments and performed its responsibilities under IDEA to provide the Child with a program which would allow him to receive educational benefit in the least restrictive environment. The

12

school system provided the Child with a non-public structured program in an attempt to deal with his behavioral issues. The Child continued to demonstrate significantly inappropriate social and emotional behaviors that have interfered with his ability to make educational progress. In addition, the Child has not shown a readiness to derive social or emotional benefits from being with non-disabled peers in a public school setting. The MCPS witnesses concurred in their expert opinions that even with the supplemental assistance being provided to the Child at his home (public) elementary school, he would not be able to make educational progress. The Parent has not persuaded me that any of the proposed placements by MCPS were inappropriate, or that she was entitled to substitute her judgment in these matters for that of the experts.

It is axiomatic that if a public school cannot provide a free appropriate public education for a child, a private school placement, at public expense, is warranted. 20 U.S.C.A. § 1412 (a)(10)(B) (2000); 34 C.F.R. §§ 300.400 – 300.402 (2001). The expert testimony in this case has persuaded me that MCPS has made all reasonable efforts to provide a FAPE for the Child in a the least restrictive environment, but that is not a public setting. The experts agree that the Child's emotional condition and behaviors prevent him from receiving educational benefit in such a setting. The school system has monitored his progress, and has supplemented services to the Child, but has been unable to program for the student in any meaningful way.

At this point, a specific non-public school for the Child has not been determined. I conclude that the preponderance of the evidence presented in this case supports a conclusion that MCPS could not provide a FAPE for the Child for the 2004-05 school year in a public school. MCPS correctly determined this to be the case, and made referrals to several private schools. However, the Parent did not cooperate with the referral process, and has kept the Child from attending school. By delaying the process, the Parent's resistance has the effect of denying her

13

son the FAPE that he is entitled by law to receive.

## CONCLUSIONS OF LAW

Based upon the foregoing Findings of Fact and Discussion, I conclude, as a matter of law

that the Parent has failed to meet her burden to show that Montgomery County Public Schools

incorrectly determined that it was unable to provide a free appropriate public education for the

Child for the 2004-05 school year in a school to the Parent's liking, and I conclude that the

Parent failed to show that the referral of the Child by Montgomery County Public Schools to a

nonpublic placement was incorrect. 20 U.S.C.§ 1413(a)(4), 34 C.F.R. 300.400 – 300.452.

## ORDER

I **ORDER** that the request for review of the placement of the Child in this matter is

hereby **DISMISSED,** and I **ORDER** that Montgomery County Public Schools may pursue its

choice of appropriate placement for the Child without further delay.

September 30, 2004
Date

Alan B. Jacobson
Administrative Law Judge

## REVIEW RIGHTS

Within 180 calendar days of the issuance of the hearing decision, any party to the hearing
may file an appeal from a final review decision of the Office of Administrative Hearings to the
federal District Court for Maryland or to the circuit court for the county in which the student
resides. Md. Code Ann., Educ. §8-413(h) (2004).

Should a party file an appeal of the hearing decision, that party must notify the Assistant
State Superintendent for Special Education, Maryland State Department of Education, 200 West
Baltimore Street, Baltimore, MD 21201, in writing, of the filing of the court action. The written
notification of the filing of the court action must include the OAH case name and number, the
date of the decision, and the county circuit or federal district court case name and docket number.

The Office of Administrative Hearings is not a party to any review process.

14



## The University of the State of New York

### The State Education Department
#### State Review Officer

No. 07-125

Application of the BOARD OF EDUCATION OF THE
TUXEDO UNION FREE SCHOOL DISTRICT for review of a
determination of a hearing officer relating to the provision of
educational services to a child with a disability

**Appearances:** ,
Shaw, Perelson, May & Lambert, LLP, attorney for petitioner, Jeffrey J. Schiro, Esq., of counsel

Davis and Davis Attorneys at Law, attorney for respondents, Charles G. Davis, Esq., of counsel

#### DECISION

Petitioner, the Board of Education, appeals pursuant to section 8 NYCRR 279.10(d) of the Regulations of the Commissioner of Education, from an interim decision of an impartial hearing officer determining the pendency placement for respondents' daughter during a due process proceeding challenging the appropriateness of petitioner's recommended educational program for the student for the 2006-07 school year. The impartial hearing officer found that the student's pendency placement consisted of the educational program and services set forth in the student's October 3, 2006 individualized education program (IEP). The appeal must be sustained in part.

The hearing record is sparse with regard to the student's educational history. Petitioner's Committee on Preschool Special Education (CPSE) identified the student as a preschool student with a disability, and in an IEP for the 2006-07 school year dated October 3, 2006, the CPSE recommended that the student receive special education in a 6:1+2 special class (Pet. Ex. B at pp. 1-2). According to petitioner, the CPSE also supplemented the student's preschool program by recommending a special education itinerant teacher (SEIT), a teaching assistant and related services including occupational therapy (OT), physical therapy (PT), speech-language therapy, and parent training (Pet. ¶ 7; Pet. Ex. B at pp. 1-3). The October 2006 IEP indicated that the student was eligible for extended school year (ESY) services (Pet. Ex. B at p. 1). The October 2006 IEP also noted that the student required services on Saturdays because her service providers observed that it takes more time to focus the student and engage her in tasks on Mondays (id. at

p. 2). The student's eligibility for special education and related services is not in dispute in this appeal (see 8 NYCRR 200.1[zz]).

In a due process complaint notice dated May 7, 2007, respondents alleged, among other things, that the student attended the CPSE's recommended preschool from September 2006 until December 2006, which used applied behavioral analysis (ABA) therapy (Pet. Ex. A at pp. 5-6). Respondents described several reasons why they were dissatisfied with the recommended program during fall 2006, and they alleged that the October 2006 IEP was substantively inappropriate, that the preschool failed to comply with the IEP and that the student did not make progress (id. at p. 6). After the conclusion of the holiday break in December 2006, they enrolled the student in a full-day, integrated, sensory-based learning program located in New Jersey, which they contend is an appropriate available alternative placement (id. at pp. 10-11). Respondents seek reimbursement for the cost of tuition at the private school in New Jersey for a portion of the 2006-07 school year (id. at pp. 3, 10).

On August 7, 2007, petitioner's Committee on Special Education (CSE) convened to transition the student from the CPSE to the CSE and to develop an IEP for the student for the 2007-08 school year (Pet. Ex. D at p. 1). The CSE recommended classifying the student as having multiple disabilities and recommended placement in an 8:1+2 special class at a Board of Cooperative Educational Services (BOCES) facility with related services of speech-language therapy, OT and PT (Pet. Ex. D).[1]

In an application dated August 21, 2007, respondents sought an interim determination of the student's pendency placement from the impartial hearing officer (Pet. Ex. C). Respondents asserted that they were entitled to continuation of the student's PT, OT, speech-language therapy, SEIT and "other related services" for the duration of the impartial hearing and subsequent appeals (id. at p. 3). In an interim determination dated September 21, 2007, the impartial hearing officer described the services set forth in the October 2006 IEP and found that it constituted the last agreed upon IEP at the time the proceeding was commenced (IHO Decision at p. 3).[2] The impartial hearing officer noted that school districts have some flexibility with regard to the location at which pendency services must be provided, and directed petitioner to provide "the educational program and related services . . . at an appropriate location," and noted that such location may include a particular BOCES facility (id. at p. 4). The impartial hearing officer stated that "some" of the educational components and related services listed in the October 2006 IEP were listed as being provided at the student's home or at alternate locations, and he directed petitioner to provide "any and all such programs and services" at the same location in which they had been provided (id.).

Petitioner appeals, contending that the impartial hearing officer erred in ordering petitioner to provide the student's home-based or alternate location-based services to the student

---

[1] The impartial hearing officer states that respondents were also dissatisfied with the recommendation of the August 7, 2007 CSE (IHO Decision at p. 3); however, the hearing record does not contain information regarding any claims filed after the May 7, 2007 due process complaint notice (Pet. Ex. A).

[2] Petitioner asserts that the interim pendency determination was not received by the parties until copies were transmitted via electronic mail on October 9, 2007 (Pet. Ex. F at p. 1; see Pet. ¶ 14 at n.2).

"at home." Petitioner acknowledges that some of the student's services were provided at home when the student was in preschool, but asserts that home-based services would bolster an inappropriate current private placement by respondents. Petitioner also argues that the educational program it offered to the student for the 2007-08 school year via the August 1, 2007 IEP would result in more instruction and services than the private placement secured by respondents. Petitioner further contends that providing the student with services at home poses a significant financial hardship on petitioner.[3]   Respondents were granted their request for an extension of time in which to serve their answer to the petition for review until December 10, 2007; however, an answer has not been filed (see 8 NYCRR 279.5, 279.10[e]). Notwithstanding respondents' failure to answer, I am required to examine the entire hearing record and make an independent decision based on the entire hearing record (Arlington Cent. Sch. Dist. v. State Review Officer, 293 A.D.2d 671 [2d Dep't 2002]; see 20 U.S.C. § 1415[g]; 34 C.F.R. § 300.514[b][2][i]).

The pendency provisions of the Individuals with Disabilities Education Act (IDEA) and the New York State Education Law require that a student remain in his or her then current educational placement, unless the student's parents and the board of education otherwise agree, during the pendency of any proceedings relating to the identification, evaluation or placement of the student (20 U.S.C. § 1415[j]; Educ. Law §§ 4404[4], 4410[7][c]). Pendency has the effect of an automatic injunction, and the party requesting it need not meet the requirements for injunctive relief such as irreparable harm, likelihood of success on the merits, and a balancing of the hardships (Zvi D. v. Ambach, 694 F.2d 904, 906 [2d Cir. 1982]; see Wagner v. Bd. of Educ., 335 F.3d 297, 301 [4th Cir. 2003]; Drinker v. Colonial Sch. Dist., 78 F.3d 859, 864 [3d Cir. 1996]). The purpose of the pendency provision is to provide stability and consistency in the education of a student with a disability and "strip schools of the unilateral authority they had traditionally employed to exclude disabled students . . . from school" (Honig v. Doe, 484 U.S. 305, 323 [1987]; Evans v. Bd. of Educ., 921 F. Supp. 1184, 1187 [S.D.N.Y. 1996] citing Bd. of Educ. v. Ambach, 612 F. Supp. 230, 233 [E.D.N.Y. 1985]). The pendency provision does not mean that a student must remain in a particular site or location (Concerned Parents and Citizens for the Continuing Educ. at Malcolm X Pub. Sch. 79 v. New York City Bd. of Educ., 629 F.2d 751 [2d Cir. 1980]; Application of the Bd. of Educ., Appeal No. 99-90), or at a particular grade level (Application of a Child with a Disability, Appeal No. 95-16). Furthermore, the pendency provisions of the Commissioner's Regulations do not require that a student who has been identified as a preschool student with a disability must remain in a preschool program for which he or she is no longer eligible pursuant to Education Law § 4410 (8 NYCRR 200.16[h][3][i]; see 8 NYCRR 200.5[m]).

Under the IDEA, the pendency inquiry focuses on identifying the student's then current educational placement (Mackey v. Bd. of Educ., 386 F.3d 158, 163 [2d Cir. 2004], citing Zvi D., 694 F.2d at 906). Although not defined by statute, the phrase "then current placement" has been found to mean the last agreed upon placement at the moment when the due process proceeding is commenced (Murphy v. Bd. of Educ., 86 F. Supp. 2d 354, 359 [S.D.N.Y. 2000] aff'd, 297 F.3d 195 [2002]; Application of a Child with a Disability, Appeal No. 01-013; Application of the Bd. of Educ., Appeal No. 00-073). The U.S. Department of Education has opined that a student's

---

[3] The hearing record is unclear with regard to where the student is currently attending school and what special education services she is receiving.

3

then current placement would "generally be taken to mean current special education and related services provided in accordance with a child's most recent [IEP]" (Letter to Baugh, 211 IDELR 481 [OSEP 1987]; see Susquenita Sch. Dist. v. Raelee, 96 F.3d 78, 83 [3d Cir. 1996]). However, if there is an agreement between the parties on placement during the proceedings, it need not be reduced to a new IEP, and it can supersede the prior unchallenged IEP as the then current placement (Evans, 921 F. Supp. at 1189 n.3; see Bd. of Educ. v. Schutz, 137 F. Supp. 2d 83 [N.D.N.Y. 2001] aff'd, 290 F.3d 476, 484 [2d Cir. 2002]).

In this case, I note that petitioner has agreed to provide the student with the related services that are listed in the October 2006 IEP as the student's pendency and does not challenge the impartial hearing officer's decision in that regard (Pet. ¶ 16).[4]  The only issue raised in the petition for review is the location at which a portion of the student's pendency program should be implemented.  With regard to petitioner's argument that providing the student with "home-based services would only serve to bolster an inappropriate private placement," I find this argument is unpersuasive with regard to pendency because, in essence, it prematurely addresses the merits of respondents' claims for tuition reimbursement rather than the issue of the student's pendency placement.  The likelihood of respondents' success on the merits is not relevant to the issue of pendency (Zvi D., 694 F.2d at 905).  A student's pendency placement is not necessarily the placement that will ultimately be decided to be the appropriate placement after a hearing on the merits, since pendency placement and appropriate placement are separate and distinct concepts (Mackey, 386 F.3d at 160 [2d Cir. 2004]; Application of the Bd. of Educ., Appeal No. 05-006).  The issue of whether respondents' unilateral placement is appropriate is a matter that the parties must address on the merits of respondents' tuition reimbursement claim.

With regard to the location(s) at which petitioner must offer the student's pendency program, I note that the impartial hearing officer's decision inconsistently directed petitioner to "implement the educational program and related services . . . at an appropriate location" while also ordering petitioner, without specificity, to implement "some of the educational components and related services" that were provided at home or at alternate locations to be provided in the same location where they had been provided (IHO Decision at p. 4).

As noted above, in the absence of an agreement with the parents, a school district may not change a student's then current educational placement until the proceedings are finally concluded (20 U.S.C. § 1415[j]; Educ. Law §§ 4404[4], 4410[7][c]; 34 C.F.R. § 300.518[a]; 8 NYCRR 200.5[m]).  However, whether a student's educational program is reflective of special education needs that are uniquely tied to a specific site or location is a distinct question (see Application of a Child with a Disability, Appeal No. 07-061).  In Letter to Fisher, the United States Department of Education Office of Special Education Programs (OSEP) specifically addressed the question of what constitutes a change in educational placement and opined that consideration should be given to whether a change in educational placement has occurred on a

---

[4] Under the IDEA, a school district is not required "to pay for the cost of education, including special education and related services, of a child with a disability at a private school or facility if that [school district] made [free appropriate public education (FAPE)] available to the child and the parents elected to place the child in a private school or facility" but may be required to reimburse the parents if it is determined that the school district failed to offer a FAPE" (34 C.F.R. § 300.148[a], [c]).  Although unclear in this case, it appears that petitioner agreed to provide the student with related services.

4

case-by-case basis, as it is a very fact specific inquiry (Letter to Fisher, 21 IDELR 992 [OSEP 1994]). OSEP concluded that whether a change in educational placement has occurred turns on "whether the proposed change would substantially or materially alter the child's educational program" (id.). OSEP set forth the following factors to be considered in determining whether a change in educational placement has occurred:

> whether the educational program set out in the child's IEP has been revised; whether the child will be able to be educated with nondisabled children to the same extent; whether the child will have the same opportunities to participate in nonacademic and extracurricular services; and whether the new placement option is the same option on the continuum of alternative placements

(Letter to Fisher, 21 IDELR 992).

A determination regarding whether a change in location would constitute an impermissible modification of the student's pendency placement must be supported by evidence in the record (see Application of a Child with a Disability, Appeal No. 01-003). An impartial hearing officer must ensure that there is an adequate record upon which to premise his or her decision and permit meaningful review of the issues (Application of the Bd. of Educ., Appeal No. 04-017; Application of a Child with a Disability, Appeal No. 02-003; Application of the Bd. of Educ., Appeal No. 01-087). The Commissioner's Regulations provide that "[t]he decision of the impartial hearing officer shall be based solely upon the record of the proceeding before the impartial hearing officer, and shall set forth the reasons and the factual basis for the determination." (8 NYCRR 200.5[i][4][ii]).

In this case, no hearing was held on the issue of pendency and the impartial hearing officer noted that he made his pendency determination based on a "limited record" (IHO Decision at p. 3). The October 2006 IEP indicates that the student's OT, PT and speech-language therapy were offered in multiple locations such as the student's home, a therapy room and an "office" (Pet. Ex. B at pp. 1-2); however, there is no basis in the hearing record for determining whether the services can be provided at new locations taking into consideration the criteria articulated by OSEP (see Letter to Fisher, 21 IDELR 992). Furthermore, the teaching assistant and SEIT services were provided to the student in a "flexible setting" and the hearing record does not clarify what "flexible setting" means (Pet. Ex. B at pp. 1-2). I also note that with regard to the student's ESY services, the location of the student's special education and related services are different for reasons that are not apparent in the hearing record (id. at p. 3). Based upon the scarcity of information relevant to the parties' dispute, I find that the hearing record is not adequate to conduct a meaningful review of whether changing the location of the student's SEIT services, teaching assistant, OT, PT, and speech-language therapy would substantially or materially alter the student's educational program (see Letter to Fisher, 21 IDELR 992; Application of a Child with a Disability, Appeal No. 01-003). I also find that the impartial hearing officer's orders are inconsistent and unclear pertaining to the location of the delivery of the pendency services to the student such that his decision must be annulled (Application of the Dept. of Educ., Appeal No. 06-002). Accordingly, I will annul the impartial hearing officer's decision and remand this matter to the impartial hearing officer for a pendency decision based

upon development of an adequate record regarding the location of the pendency services and whether petitioner's proposed change in the location of the student's pendency services listed on the October 2006 IEP would constitute a change in the student's educational placement.

With regard to the adequacy of the record, I further note that the hearing record contains no explanation whatsoever for the inordinate delay in conducting the impartial hearing. While respondents' due process complaint notice is dated May 7, 2007, it appears that in the ensuing five months, the case did not proceed further than prehearing conferences and the issuance of the interim determination (Pet. Exs. A at p. 3; H). I caution the impartial hearing officer to comply with the Commissioner's Regulations with regard to granting extensions and rendering a timely final decision in the case (8 NYCRR 200.5[j][3][xiii], [5]).

I have considered petitioner's remaining contentions, including the contention regarding its financial burdens, and find them unpersuasive.

### THE APPEAL IS SUSTAINED TO THE EXTENT INDICATED.

**IT IS ORDERED** that the impartial hearing officer's interim determination dated September 21, 2007 is annulled and

**IT IS FURTHER ORDERED** that this matter shall be remanded to the impartial hearing officer who shall, unless the parties agree to an alternative pendency placement, convene the impartial hearing, develop a hearing record regarding the need to implement the student's pendency placement at a specific site or location, and render a decision within 15 calendar days of receipt of this decision; and

**IT IS FURTHER ORDERED** that if the impartial hearing officer who issued the interim decision dated September 21, 2007 is not available, a new impartial hearing officer shall be appointed.

Dated:     **Albany, New York**
           **January 9, 2008**                     _____
                                                    **PAUL F. KELLY**
                                                    **STATE REVIEW OFFICER**

6

## SPECIAL EDUCATION CITIZEN COMPLAINT NO. 04-13

### PROCEDURAL HISTORY

On March 26, 2004, the Office of Superintendent of Public Instruction (OSPI) received a Special Education Citizen Complaint from the Parent of a student ("Student") attending the Seattle School District ("District"). The complaint asserts a claim that the District violated the Individuals with Disabilities Education Act ("IDEA"), or a regulation implementing the IDEA, with regard to the Student's education.

On April 1, 2004, OSPI acknowledged receipt of this complaint and forwarded a copy of it to the District Superintendent. The District was asked to respond to the allegations made in the complaint, as required by WAC 392-172-338.

On April 26, 2004, OSPI received the District's response to the complaint and forwarded it to the Parent this same day. The Parent was invited to submit a reply that contained any information she had that was inconsistent with the District's response.

On May 11, 2004, the Parent notified OSPI that she had not yet received the District's response. OSPI reissued the District's response this same day. The Parent was invited to submit a reply by May 24, 2004. OSPI extended the date for issuing this decision to June 11, 2004.

On May 20, 2004, OSPI received the Parent's reply to the complaint and forwarded a copy to the District this same day.

In conducting its investigation in order to address the allegations made in the complaint OSPI considered all of the information provided by both the Parents and the District.

### OVERVIEW

The Student is in the fourth grade and is eligible for special education services under the specific learning disability category. She is assigned to a self-contained language-based classroom, and receives specially designed instruction in reading, written language, math, social skills and speech.

In the fall of 2002, the Student was subjected to and involved in bullying activities. Although the District made some adjustments to diminish the problem, the Parent continued to believe her daughter's safety was at risk since the alleged bully remained in the same classroom. In October 2002, the Parent partially withheld the Student from accessing her special education services on a full time basis until the District took a more drastic action of removing the bully from the Student's classroom. The Student

continued to access speech, OT/PT services and received some assignments from the special education teacher.

In February 2003, the District proposed moving the Student to another neighboring school in order to get her fully enrolled. The Parent agreed with this proposal and the Student remained in the other school until the end of the 2002-2003 school year. The Student returned to her previous school in the language-based program at the beginning of the 2003-2004 school year.

The Parent alleges the District did not follow procedures when it changed the Student's placement during the 2002-2003 school year, and that the Student's current placement is not appropriate due to age differences with peers. The Parent further asserts the Student was emotionally traumatized by the earlier bullying incidents. The Parent contends the Student would have made more academic gains had she remained in the language-based program.

The District denies the allegations and maintains that District staff followed procedures when it changed the location of services for the Student. The District also contends the Student made progress during the 2002-2003 and 2003-2004 school years.

Although it is not the subject of this complaint, the District admits that it did not conduct a full investigation of the bullying allegations, even though informal interventions were implemented to ensure the Student would be safe while at school. The District has offered to provide five sessions of counseling by a mutually agreeable counselor to the Student.

## ISSUES

1. Did the District follow procedures when it changed the Student's placement in February 2003 for the remainder of the school year?

2. Did the District follow procedures when determining the Student's current placement to enable her to progress in the general education curriculum with same aged peers?

## LEGAL STANDARDS

Placement Procedures: A special education student's educational placement is decided annually. This is a team decision, and the student's parent must be afforded the opportunity to participate in any placement decision. WAC 392-172-15705. The selection of an appropriate placement for the student must be based on the IEP, least restrictive environment requirements, placement options that provide a reasonably high probability of assisting the student to attain annual goals, and consideration of any potential harmful effect that the placement decision might have on the student or on the quality of services that the student needs. WAC 392-172-180. The placement team makes an appropriate placement decision for a student by considering: (a) the

{CITIZEN COMPLAINT No. 04-13) – Page 2

educational program, as established by the IEP team and set out in the IEP; (b) the specific option which the team selects from the district's continuum of placement options in which the IEP can be implemented; and (c) the location that the team selects to implement the IEP. Unless the team decides otherwise, the student shall be educated in the school closest to the student's home. WAC 392-172-180.

Change of Placement: Placement decisions are based upon a student's IEP. When a school district proposes or refuses to change a student's placement it must provide prior written notice. Prior written notice pertaining to a change in placement must describe the evaluation data used as a basis for the decision. In determining whether a change in placement, as opposed to a change in location is being proposed, the school district must determine whether the change would substantially or materially alter the educational program. In making such a determination the school district must consider the following factors: (1) whether the IEP was revised (2) whether the child will be able to be educated with nondisabled children to same extent; (3) whether the child will have the same opportunities to participate in nonacademic and extracurricular services; (4) whether the new placement option is the same option on the continuum of placement options. If it is determined that the change in placement involves only a change in location, and not a corresponding change in program, the formal prior written notice requirements do not apply. Letter to Fisher, 21 IDELR 992 (OSEP 1994); See also, Orcas Island (WA) Sch. Dist. No. 137 Office for Civil Rights, 31 IDELR 12 (OCR Reg. X, 1999).

## FINDINGS OF FACT

1. Under the Student's May 2002 IEP, she received 1640 weekly minutes of specially designed instruction in the self-contained language-based program. The IEP contained goals and objectives in the areas of reading, written language, math, language use in the classroom, speech, and fine and gross motor skills. The Student was integrated with the general education second grade class for music, library and physical education specialists' time during the week.

2. The language-based program is designed to assist students with significant deficits in speech and language skills in a small, self-contained classroom environment. At any given time during a school year, the program might serve students between kindergarten through fifth grade depending on the needs of eligible special education students. The Student was enrolled in the lanuage-based program for the 2001-2002 and beginning of the 2002-2003 school years.

3. On September 20, 2002, the Parent witnessed a classmate attempt to charge her daughter in the school cafeteria. The Parent automatically stepped in front of her daughter to prevent the classmate from attacking her.

4. On September 23, 2002, the Parent requested the relocation of her daughter's desk away from the classmate as a result of the September 20 incident. The special education teacher immediately granted the Parent's request.

(CITIZEN COMPLAINT No. 04-13) – Page 3

5. On September 25, 2002, the Parent wrote the principal expressing her concerns regarding the Student's welfare.

6. On September 26, 2002, there was a second incident where the said classmate tried to hit the Student and was restrained by a paraeducator.

7. On October 3, 2002, the Student was written up on a conduct notice for hitting the said classmate with a pencil.

8. On October 7, 2002, the principal contacted the Parent to arrange a meeting to discuss her concerns regarding the incident on September 20. The Parent replied this same day and noted she believed the classmate should be removed from the classroom since all the students in the language-based classroom were in a hostile and threatening environment, including the teacher and paraeducator. The Parent further stated her daughter, not the classmate that had bullied her, was in the right classroom. There was no documentation submitted for this complaint to determine whether or not a meeting was arranged and held to address the Parent's concerns.

9. On October 16, 2002, the Student was written up for kicking the classmate that had previously attempted to assault her however, the Parent argued the classmate punched the Student first. The Parent explained via letter to school staff that her daughter was traumatized and emotionally scarred by the incidents that continued to occur.

10. On October 22, 2002, the Parent informed the school that she would be keeping the Student out of school until the school was able to provide a safe and secure environment. She further reiterated that her daughter was traumatized and emotionally scarred from the past events.

11. On October 23, 2002, the Student's special education classroom teacher sent the Student a note and some assignments to work on at home while "all the adults can help so that you feel safe and good about coming back to school." The Student continued to receive speech and OT/PT services one time a week.

12. On October 28, 2002, the principal sent a letter to the Parent explaining that the Student's classroom environment was safe and secure based on her investigation into the Parent's concerns. The principal further explained she was concerned about the Parent not making the Student fully available and that it may be jeopardizing the Student's education. The principal asked the Parent to contact her to discuss getting the Student back in school on a full time basis. There was no documentation submitted as part of this complaint to determine whether or not a meeting was held to address the Parent's concerns.

13. The Student did not attend school, except for speech and OT/PT services, between October 23, 2002 and March 7, 2003.

14. The District initiated the reevaluation process for the Student sometime beginning in January 2003.

15. On January 31, 2003, the District held an IEP meeting to address the Student's enrollment status, placement options, and reduction in IEP minutes. The prior written notice was issued with the invitation and did not document the decisions that were made at the IEP meeting, nor reflected a reduction in IEP minutes based on the Student's part-time enrollment status.

16. On February 28, 2003, the IEP team, including the Parent, amended the IEP to reflect a change in location of services from the language-based program to an intermediate class until the end of the school year. No other changes were made to the Student's IEP.

17. The District completed a reevaluation of the Student on March 7, 2003. The results indicated the Student made steady progress when she was in school full time and that her reading and math reasoning skills were in the borderline range, and reading comprehension, math calculation, and written expression were in the deficient range. The reevaluation report noted the impact of the Student's absences and the effect the bullying had on her overall emotional well-being. It further noted behaviorally, the Student became fearful in the classroom and was unable to focus on academics. The reevaluation team recommendations noted that the Student might benefit from assistance in developing trust with male peers as a result of her negative past experience.

18. The Student began attending the intermediate class at the other school site in March 2003. The Student received the same special education and related services as she did at her previous placement in the language based program.

19. According to the Student's special education teacher of the intermediate program, the Student adjusted very quickly in her new classroom. The classroom was very structured, and the Student was very comfortable in her new environment and not at all reluctant to associate with her male peers. The teacher stated the Student was very successful in her academics, worked well with a team of other students, and participated in community activities with classmates.

20. A new IEP was developed on May 27, 2003. The IEP contained the same services indicated in the previous IEP and updated the present levels of educational performance, goals and objectives. In all academic areas, the Student was at a mid-first grade level. In speech, the Student made substantial gains in her Mean Length of Utterance (MLU) from 3.1 words per sentence on 1/18/03 to 9.1 words per sentence on 5/27/03.

(CITIZEN COMPLAINT No. 04-13) – Page 5

21. According to the June 2003 IEP progress report, the Student made solid gains in all academic areas and communication. Although the Student could have remained in her new placement, the Parent opted for the Student to return to the language-based program at her previous school for the 2003-2004 school year.

22. When the Student started the 2003-2004 school year, she originally rotated with the rest of the language-based class, that was made up of mostly kindergarten aged students, into a kindergarten general education class during specialists' times.

23. On November 26, 2003, the IEP was amended to integrate the Student into a third grade general education class.

24. According to the Student's November 2003 progress report, she maintained skills in all academic areas and communication.

25. In December 2003, the Student began participating in an all girls' social skills group with same aged peers once per week.

26. According to the Student's March 2004 progress report, she made rapid progress in academic areas and communication.

## CONCLUSIONS

1. This investigation was limited to a review of whether the allegations made in the complaint demonstrate a violation of Part B of the IDEA, its implementing federal regulations, or corresponding state regulations. It did not extend to a review of whether the District was negligent in responding to the Parent's concern that the Student was bullied in school.

2. Although OSPI did not investigate the bullying allegations, it is worth noting the effects the bullying had on the Student's emotional well-being. In reports provided by the Parent and the Student's special education classroom teacher, the Student endured fear and distress. However, the District did not reconvene the IEP team to address the Student's fears, enrollment status, or other placement options until the end of February 2003. Although the change in location of services was procedurally appropriate in order to get the Student fully enrolled in school again, the Student's IEP should have addressed her emotional well-being to ensure it did not have a negative impact on her ability to progress. This is further supported by the reevaluation results which noted the Student would benefit from assistance in developing trust with male peers.

3. After the principal initially investigated the Parent's concern regarding her daughter's safety as early as October 28, 2002, the Parent continued to keep the Student out of school, with the exception of obtaining speech and OT/PT

services. This was at the Parent's discretion, despite the District's efforts to convince her otherwise. It cannot be determined whether the Student would have made greater progress if she had remained in the language based program for the entire 2002-2003 school year. All in all, the Student made steady gains; more rapidly so after she attended school on a full time basis.

4. The District followed procedures when it proposed a change in location of services at another school site. The Student received the same level of special education and related services as she did in her previous school. The Parent was provided a meaningful opportunity to participate in the decision to move the Student and agreed to the new placement. The record shows the Student made progress during the period she attended the intermediate classroom in the spring of 2003.

5. The District acted in good faith at the time it changed the Student's location of services in February 2003. However, the District failed to properly address the Student's overall well-being, while knowing it interfered with her ability to focus on her academics and otherwise affected her participation in the general education curriculum. Therefore, the District will address the Student's need for counseling services within the context of the Student's IEP.

## CORRECTIVE ACTION

By **June 24, 2004,** the District will submit to OSPI documentation that the following corrective action has been completed:

1. OSPI accepts the District's proposed corrective action submitted in its response to this complaint. The District will ensure its corrective action is provided consistent with the following:

   (a) IEP Meeting to Address Need for Counseling Services; Prior Written Notice: By **June 24, 2004** the Student's IEP team will meet to review all available data provided by both the Parent and the District staff to address the Student's need for counseling services.

   When the team has finalized the IEP, the District will provide the Parent with prior written notice of its proposal to implement the IEP, including the counseling sessions. That prior written notice will comply with the content requirements of WAC 392-172-306 and will include a full explanation of the Parents' procedural safeguards.

   The District will submit to OSPI: (a) a list of the people attending the IEP meeting; (b) notes or minutes summarizing the discussions held and decisions reached at that meeting; (c) any new IEP developed as a result of the meeting; (d) any prior written notice issued as a result of any decision made at that meeting; and (e) a schedule outlining the counseling session dates.

NOTE: To properly document that it has completed the required corrective actions, the District will submit a completed copy of the attached Corrective Action Plan, including on that form (or attached to that form) a complete statement of the specific actions it has taken in response to this decision. *(The district may request an electronic version of this form by calling Tia Bertrand at [360] 725-6075.)*

### RECOMMENDATION

The District should remind staff at the Student's current school that it must address decisions made following IEP meetings through prior written notice.

Dated this ___ day of May, 2004,

---

Douglas H. Gill, Ed.D.
Director, Special Education Operations
Office of Superintendent of Public Instruction
PO Box 47200
Olympia, WA 98504-7200

---

### THIS WRITTEN DECISION CONCLUDES OSPI'S INVESTIGATION OF THIS COMPLAINT

**IDEA provides mechanisms for resolution of disputes affecting the rights of special education students. This decision may not be appealed. However, parents (or adult students) and school districts may raise any matter addressed**

(CITIZEN COMPLAINT No. 04-13) – Page 8

in this decision that pertains to the identification, evaluation, placement, or provision of FAPE to a student in a due process hearing. Decisions issued in due process hearings may be appealed. Parent (or adult students) and districts may also use the mediation process to resolve disputes.    The state regulations implementing mediation and due process hearings are found at WAC 392-172-310 through 317 (mediation) and WAC 392-172-350 through 364 (due process hearings.)

(CITIZEN COMPLAINT No. 04-13) — Page 9